ARTHUR THORNHILL, Appellant, v. RUGGIERE MASUCCI, et al., Respondents.

Kansas City Court of Appeals, December 1, 1919.

1. **PROMISSORY NOTES: Payment to Agent: Estoppel.** While it is the duty of a debtor making a payment on a promissory note to an agent to see that the agent is in possession of the note, or has authority to receive payment, yet if the owner of the note acts in such a manner as to lead a reasonable man to believe that the agent has authority, he will be estopped to deny the validity of payment to the agent.

2. ————: ————: ————. Where plaintiff having knowledge of facts which would lead a debtor to reasonably believe that plaintiff's agent has authority to accept payment of a note, and where he in part ratifies the acts of the agent, and for a period of four years after the note has been paid does nothing, he will be estopped to deny the validity of the payment to the agent.

Appeal from Jackson Circuit Court.—*Hon. Wm. O. Thomas*, Judge.

AFFIRMED.

*Stubenrauch & Hartz* for appellant.

*Cooper, Neel & Wright* and *Strother & Campbell* for respondents.

*Appeal from Jackson Circuit Court.*

TRIMBLE, J.—This is an action in equity, by the holder of a promissory note, secured by deed of trust, to cancel a release made upon the margin of the record

thereof, to obtain a decree that the note is an existing and unpaid obligation and to quiet plaintiff's title thereto as against the claims and demands of the defendants, especially the defendants, Masucci, who are claiming that said note has been paid in full. The decree of the chancellor was in favor of said defendants, and plaintiff has appealed.

On June 8, 1908, Frank J. O'Loughlin, a real estate broker in Kansas City, negotiated a loan of $1000 from plaintiff Thornhill to George E. McManus, secured by a deed of trust on the latter's real estate. He did not do this as McManus's agent and the inference is plain that he did it for plaintiff. The note was made payable to O'Loughlin's brother, Charles. J. O'Loughlin, was due three years after date and bore six per cent simple interest payable semi-annually. The payee, however, immediately endorsed the note over to plaintiff and the latter gave O'Loughlin a check to McManus for the amount of the loan. McManus did not know Thornhill, but about seven months after the loan was made O'Loughlin introduced Thornhill to McManus as the man who had lent the money. By its terms, the note was payable at the Fidelity Trust Company, but McManus paid the interest twice a year regularly to Frank J. O'Loughlin up to December 20, 1910. Sometimes O'Loughlin would come after these payments but more frequently McManus would pay them to O'Loughlin at the latter's office, though never, it seems, when Thornhill was there. O'Loughlin would turn the money over to plaintiff by giving his personal check therefor when the latter called. Plaintiff and O'Loughlin were "associated together," had frequent business dealings with each other and the former was in the latter's office "lots of times."

In December, 1910, McManus sold the property to the defendants, the Masuccis, who are Italians unable to speak or write English. They were to assume the deed of trust, and continued to pay the interest thereon as McManus had been doing. The interest due Decem-

ber 8, 1911, was not paid when due, and on December 20, 1911, O'Loughlin wrote to the Masuccis a letter calling their attention to the matter and directing them to call at his office and pay it, which they did and continued to do thereafter; and plaintiff continued to get from O'Loughlin these interest payments as he had theretofore done.

On June 8, 1911, the note fell due and the Masuccis applied to O'Loughlin for a three years extension which O'Loughlin granted, giving them a written agreement to that effect dated June 8, 1911, and signed "A Thornhill by Frank J. O'Loughlin." Such an extension, made with authority, had the effect of extending the note until June 8, 1914. Thornhill undoubtedly ratified the extension for he endorsed on the note the fact of the extension but the endorsement says the note is extended to *December 8, 1913.*

In June, 1913, the Masuccis paid $300 on the principal of the note to O'Loughlin and received from him a receipt to that effect and signed F. J. O'Loughlin as agent for Thornhill. In December, 1913, they paid $500 and obtained a similar receipt, and on June 8, 1914, the day the note fell due under the extension, they paid the remaining $200, and all interest, in full of said note, and received a similar receipt together with what purported to be the note itself. This note was in the exact words of the real note even to the misspelling of the word "semi" therein. It was indorsed in blank, without recourse, by Charles J. O'Loughlin, the payee therein, and had the two credits of June 8, and Dec. 3, 1913, on the principal. Frank J. O'Loughlin went with the Masuccis to the recorder's office and there released the deed of trust as assignee. This note, together with the insurance papers and abstract, which O'Loughlin had always kept (and from whom Masuccis got them when he bought the property), were all turned over to the Masuccis, who went away thinking everything was all right and that their home was fully paid for; and they rested secure in that belief until

in March, 1918, when they were served with summons in this suit by Thornhill, he claiming that the note had never been paid to *him,* and that the note by which the release was made .was a forgery, which no doubt it was.

Plaintiff claims that he was always in possession of the true notes and that O'Loughlin never had possession thereof after plaintiff gave his check for its proceeds. There are, however, some peculiar circumstances connected with it which are not satisfactorily explained. The various interest payments up to. and including June 8, 1912, appear credited upon the note by plaintiff on the dates thereof. Plaintiff was careful to make these credits upon obtaining the money on them, so much so that he placed his initials after each of said credits. But no credits appear on the note for the interest due December 8, 1912, June 8, 1813, December 8, 1913, or June 8, 1914. As the Masuccis paid. $300 in June, 1913,and $500 in December, 1913, the interest on the note, at least in December, 1913, and June, 1914, would have been very much less than theretofore, and had such lessened credits appeared on the note, they would have unquestionably revealed that plaintiff acquiesed in the payments made by the Masuccis on the principal. Skipping the four payments of interest due from December, 1912, to June, 1914, the note held by plaintiff has credits of interest claimed to have been paid regularly from December 8, 1914, to December 8, 1917, both inclusive. Plaintiff claims that these payments were made by O'Loughlin regularly as before, and he says he thought everything was all right until O'Loughlin, having become involved, absconded and left the city some time in first half of the year, 1918, upon learning which the plaintiff took his note to an agent and caused an examination to be made with the result that it was discovered that the deed of trust had been released, and then this suit was brought March 5, 1918. Plaintiff at first testified explicitly that the reason he took the note to his agent and had an investigation made was because

*the interest had not been paid.* If, as plaintiff claims, any interest was paid by O'Loughlin to him on December 8, 1917, it is remarkable that he should, *before* the next interest pay day, have the note investigated because "there was no interest paid." And it appears from plaintiff's own testimony, and that of his agent, that at the time he took the note to him for investigation, there were certainly no credits of interest thereon *after* that of December 8, 1914, and it is likely that the one of December 8, 1914, was not on there either. They admit that the "last interest credits" were not on the note at the time it was brought to the agent for investigation, but were put on by the agent himself at one time in order, as the agent says he told plaintiff, that the note should show "the exact condition of affairs." He put them on because plaintiff told him the interest was *all paid up.* Plaintiff admits he kept no memoranda as to when the interest was paid and only fixed the dates of the credits by the fact that those were the dates when the payments were due. It is true, the evidence of plaintiff and his agent, later on, limits the credits, so put on at one time, to the "last *six* credits" and as there are *seven* credits appearing after the endorsement of the extension, the one of December 8, 1914, being the first of the seven, it might seem that this last-mentioned credit was put on by plaintiff. However, in all of the credits preceding the one of December 8, 1914, the plaintiff was careful to put his initials after each, but no initials appear after the one of that date. It appears just as the other six immediately following it which it is admitted were not put on by plaintiff at all but only by his agent, and that, too, after the note was more than four years overdue from the termination of the extension. Plaintiff knew McManus had sold the property but says he made no effort to discover who was owing the note nor who owned the property, nor anything whatever about it, although the evidence discloses that he and O'Loughlin were on intimate terms and that Masucci and plaintiff were both down at the city market

where the former saw the latter but did not know who he was.

From the foregoing, it is not at all certain that and indeed it is doubtful if, any interest was ever paid plaintiff by O'Loughlin after December 8, 1914, and even if any was paid to him on that date, no amount is stated which would disclose whether the interest paid was the amount which would be due on the full note or only on the balance after the payment by the Masuccis. If no interest was paid to plaintiff after that date, then plaintiff carelessly let the matter run along for four years after the Masuccis had fully paid the note and had it released of record, during the greater portion of which time Frank O'Loughlin was in the city and, presumably, could have been made to respond; and it was not until after the lapse of this great length of time and after O'Loughlin had absconded, that plaintiff took any steps to ascertain the condition of his note or what had been done by his agent who concededly had complete charge of everything and full authority to do anything and everything about it, except, so plaintiff says, he did not have possession of the note and did not have authority to accept payments on the principal thereof. This last is the only thing plaintiff denies his agent had power to do, and on this denial he seeks to escape the loss caused by his unfaithful steward.

It is no doubt the rule that when a debtor owing money on a promissory note pays another as agent, it is his duty to see that the agent is in possession of the note, or, if not in possession, that the agent has authority to receive payment, or that the holder has represented or held him out as having such authority. It is also the rule that the mere fact that an agent collects, or is authorized to collect, interest does not show that he is authorized to collect principal. But these two principles are not determinative of the defendant's rights regardless of the surrounding facts and circumstances; nor do defendants admit, as plaintiff seems to think, that O'Loughlin did not have authority to receive the

principal. On the contrary, they insist that the inferences are that he did; that plaintiff knew he had collected the same, else he would not have allowed the note to run for four years beyond the date of its maturity as extended, without making any inquiry of his intimate friend and business associate as to who owed the note or why it was not paid; that the inference to be drawn from the peculiar facts concerning the alleged payments of interest by O'Loughlin to plaintiff from and after its final maturity, is that plaintiff knew it had been paid and during those years was not looking to the payers of the note but to O'Loughlin, if anyone, for repayment; that, in any event, plaintiff saw fit to ratify every act O'Loughlin did, that was in his favor and negligently remained silent for four years before denying his right to collect the principal; that, whether O'Loughlin did or did not in fact have authority to collect the principal, the facts and circumstances were such as were sufficient to lead a reasonable man to think he had such authority, and plaintiff knew, or in reason should have known, that they were such as to lead one to so think. In other words, that plaintiff is estopped to deny that his agent had such authority, all of which was duly pleaded.

The decree of the chancellor does not disclose the theory on which it was founded nor the precise facts which the chancellor found which led to its rendition. It is true, as this is an equity case, we have the right to weigh the evidence and find the fact for ourselves; but owing to the peculiar circumstances and facts in the case and the further fact that the chancellor had the witnesses before him and is in a much better position to weigh their testimony and draw inferences therefrom than we are, we are not willing to disagree with his conclusions unless they appear to us to be wrong. The evidence as to whether O'Loughlin had authority to collect the note should be considered and weighed in the light of all the circumstances surrounding the parties their business relationship to each other. [Miller v. Wilson, 126 Mo. 48, l. c. 53.] It is, however, not neces-

sary for him to have had actual authority. Where a principal's "habits and course of dealing have been such as to reasonably warrant the presumption that such other was his agent authorized to act in that capacity, whether in a single transaction, or in a series of transactions, his authority to such other person to act for him in that capacity will be conclusively presumed, so far as may be necessary to protect the rights of third persons who have relied thereon in good faith, and in the exercise of reasonable prudence, and he will not be permitted to deny that such other was his agent, authorized to do the act he assumed to do, provided that such act is within the real or apparent scope of the presumed authority." [First National Bank, etc., v. Mutual Benefit etc., Ins. Co., 145 Mo. 127, l. c. 138.] "Indeed, whenever a principal has placed an agent in such a situation that a person of ordinary prudence, conversant with business usages, and the nature of the particular business, is justified in assuming that such agent is authorized to perform in behalf of his principal the particular act, and such particular act has been performed, the principal is estopped from denying the agent's authority to perform it." [21 R. C. L., sec. 34, p. 856.] nor can it be said that plaintiff ought not to be held on the principle of estoppel because he was wholly unware of the situation. He knew enough to know, or enough to show that he should have known, that under the circumstances his debtor would be reasonably led to think that his agent had full authority to act for him. At any rate we cannot disagree with the chancellor and say plaintiff is entitled to the decree for which he prays. The judgment is affirmed. All concur.