Jack **LOUIS**, Executor of the Estate of Archard **L.** Louis, Decedent, and Trustee in Deed of Trust, Respondent,

v.

Vivian **ANDREA** and The Sarlou Realty Company, a corporation, Appellants.

No. 47329.

Supreme Court of Missouri, Division No. 2.

July 11, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 12, 1960.

Rex Parr, Kansas City, for appellant.

A. J. Granoff, Loeb H. Granoff, Kansas City, for respondent.

EAGER, Judge.

Plaintiff, as Executor, claims to be the owner of a $25,000 note secured by deed of trust; and, as Trustee in that deed of trust, he seeks foreclosure. The note and deed of trust were executed by defendants Vivian Andrea and Sarlou Realty Company, a corporation; the note was payable to Archard L. Louis, father of the plaintiff, who died on January 9, 1956. The petition alleged that the note was in default and that defendant Andrea, though not the lawful owner or assignee, had fraudulently presented it for release on February 7, 1956, as the assignee thereof, and had caused it to be cancelled and the deed of trust released of record. Plaintiff prays for the cancellation of the fraudulent assignment and release, for judgment on the note and for foreclosure. Both defendants denied plaintiff's substantive allegations; defendant Andrea alleged: that the note had been paid in full by considerations adequate and satisfactory to the deceased, that deceased had voluntarily caused the note to be marked paid and cancelled, and that he gave it and the deed of trust to her. To simplify a complicated recital of facts, we shall refer to the deceased Archard L. Louis as "Louis," to plaintiff as "Jack," and to the individual defendant as "Andrea." The other characters passing across the stage will be designated as they appear.

Louis was a married man, 55 years old at his death, with two sons; Jack was 37 at time of trial, Stanley somewhat younger. Louis had for some years operated the Louis Funeral Home at 3400 Woodland Avenue in Kansas City. The business was operated as a partnership consisting of Louis, his wife, and his son Jack. Louis and his wife Gertrude had living quarters above the funeral home. At some time in the early 40's Louis met Andrea, then a manicurist in the National Barber Shop. She was 27 years old, a divorcee, and he was about 40. She testified that from that time on he pursued her relentlessly despite her efforts for several months to discourage him, that he followed her around, and that he finally "eliminated everybody else." She testified that Louis represented himself as being separated from his wife. It appears that at times, and for somewhat extended periods, he did live away from home and that there was domestic discord. Louis associated closely with Andrea for years, in Kansas City and elsewhere, including fishing trips to the Lake of the Ozarks, Minnesota and Canada. In the spring of 1949 Louis purchased an eleven or twelve unit motel at 3707 Raytown Road in Kansas City. The total purchase price was presumably $35,000. It was decided to take title in the name of a corporation so the Sarlou Realty Company was organized with 105 shares of capital stock. Louis received one share, his attorney one share, and his aunt Sarah Louis 103 shares on April 8, 1949. The record does not show who actually furnished the purchase price, except that Andrea testified that she furnished $4,000 in cash which she had accumulated. On July 1, 1950, 102 shares were transferred to Louis, and one share to Ada Richards, presumably a qualifying share. Andrea lived at the motel and apparently ran it; Louis was there frequently and, for a time, probably lived there. Andrea testified that he told her that he wanted a place of business for her, and that the stock certificates were endorsed and turned over to her, but that no transfer to her was actually made. About 1952, if not earlier, these two began quarreling. Andrea testified that she gave Louis the stock certificates for transfer to her, but that no such transfer was ever accomplished. According to Andrea, the encounters were not merely verbal; she testified that once she was beaten so severely that she was hospitalized for several days. Both were in Police Court on September 18, 1952; she had charged Louis with disturbance of the peace and he insisted that he had merely tried to eject her from the motel at an early hour because she was intoxicated. On September 19, 1952, Andrea sued Louis for assault. On October 6, 1952, the corporation sued her, alleging that she had been employed as manager of

the motel in July 1949, that she had been discharged in July 1952, but that she had refused to leave or account for the rents; injunctions against interference in the management and an accounting were sought, and a temporary injunction was issued. On October 4, 1952, Andrea sued the corporation, Louis, and others, asking that she be declared the owner of the stock, alleging a complicated and rather ambiguous set of oral representations and agreements, and claiming that she had held the endorsed certificates until Louis procured them from her in March 1952, after which he had denied that she had any right or interest. Notwithstanding all the foregoing, Andrea testified that she and Louis continued to be most friendly and that they were frequently together. The evidence indicated, however, that Louis had lived at his home, in apparent harmony, from the latter part of 1953 until his death.

In the fall of 1954 the assault case was about to be tried. According to Andrea, Louis said that he wanted to settle the suits and forget them; that all he wanted to do was, in his words, "to satisfy my family and get them off my neck"; that he also suggested an agreement between them "ahead of time," so that the formal papers which their lawyers prepared would make no difference. An exhibit was received in evidence over strenuous objections, which purported to be that agreement. It was dated October 25, 1954, was in typewriting, was notarized, and was as follows: "To Whom it May Con*s*ern-Greetings. It is hereby agreed by the party of the first part, Archard Louis and party of the second part, Vivian Andrea, that a Twenty Five Thousand ($25,000) Dollar Mortgage executed by the party of the second part to the party of the first part, to be paid at the rate of Two Hundred ($200.00) Dollars per month as long as the party of the first part shall live. Also that mortgage be marked paid in full by party of the first part and placed in sealed envelope with this agreement and placed with a mutual friend to be given to either party

upon the death of one party." Andrea testified that Louis wrote this out in longhand, that the notary copied it on the typewriter, and that both signed it. The testimony of the notary was most vague, but he did say that the parties appeared before him. Andrea also testified that none of the lawyers knew of their secret agreement when the formal settlement was effected, and that Louis stated that he would mark the papers paid in full and give them to a mutual friend. On November 1, 1954, a complete and formal compromise agreement was executed by Louis and Andrea and verified by their affidavits (actually a sort of combined affidavit and acknowledgment). Every page was initialed, and the agreement was approved by the interested attorneys, including Andrea's present counsel. It provided for the dismissal of all suits, the execution of general releases, the transfer of the corporate stock to Andrea for the sum of $25,000, and the execution by her and the corporation of a note for that amount, payable to Louis at the rate of $200 per month, without interest except upon default, to be secured by deed of trust on the motel property. Assurances were also given in the agreement for the payment of taxes, the assumption of the first deed of trust, and for adequate insurance. General releases were executed concurrently; the release executed by Louis made specific exception of the note and deed of trust just referred to. All the litigation was dismissed. Formal corporate meetings were held on November 1, 1954, approving the compromise settlement, authorizing the execution of the note and mortgage, and electing new directors and officers. The stock was concurrently transferred to Andrea and her nominees. Andrea approved and signed the minutes. She took charge of the motel thereafter.

In 1955 Louis' health became seriously impaired. He was hospitalized twice during that year with coronary attacks. He died in the Northeast Osteopathic Hospital on January 9, 1956. He had left home on January 6, 1956, supposedly for the barber-

shop. Andrea testified that Louis came to her abode at the motel about nine or ten p. m. on January 6; that several of her relatives and friends were present; that he had been drinking but was not drunk, that he ate heartily of pizza pie and became seriously ill. She further testified that he did not want his family called, that they tried to get "Dr. Day" at his request, and that she finally prevailed upon him to go to the hospital. After Louis' death plaintiff was unable to locate the $25,000 note. He and his brother Stanley went to see Andrea about their father's watch and ring, which were asserted to be of some value; she stated that Louis had given these things to her when he became ill on the evening of January 6, and that she wanted to think this matter over. Jack testified that his father was wearing them when he last saw him on the afternoon of January 9 at the hospital. These articles, and the money on Louis' person, were the subject of later proceedings to discover assets.

Dr. Frank Day, an osteopathic physician, testified: that he had known Louis for many years and had treated him periodically; that in the spring of 1955 Louis came to his office with some "legal papers," showed them to him and wanted to leave them with him. He identified the controverted $25,000 note (from a copy) as one of the papers and testified that the original was marked "Paid in full," with Louis' signature; he also identified the secret agreement described above as another of the papers. He thought the third was a "deed." He stated that Louis put these papers in a brown envelope and sealed it; that he, Day, made notations on the envelope and had his office nurse put it in the safe or vault. He produced a memorandum listing these papers, written by him on a prescription blank, which he said he wrote that afternoon from his memory of what Louis had told him. He testified further that Louis instructed him that he should deliver these papers either to him, Louis, or to Andrea "upon request." Day attended Louis at the hospital from January 7–January 9, 1956;

he stated that Louis said that he would call his family when he got ready. He further testified that on January 18, 1956, Andrea came to his office and that he delivered this envelope to her, taking a receipt.

The $25,000 note was not produced before or at trial, though its production was repeatedly requested. Andrea testified that after she had forgotten to bring the note to a deposition (or to the probate court) she put it in her purse so that she would be sure to have it; that she showed it to sundry people, and that she finally lost it. Her testimony of the losing of it is most vague and seemingly evasive. After carrying it around and displaying it to various intimate friends and relatives, she and one Opal Cavanaugh drove to Sedalia on a Sunday afternoon to visit a Jack Alpert, who had known Louis casually for a short time. Alpert did not know they were coming; he operated a restaurant and tavern. They visited at his home and at a golf club. Andrea testified that she showed these papers to Alpert at the golf club and that (referring to the note) the "last time I saw it was when Jack was looking at it"; that she thought "it was all in the envelope." She guessed he gave it back, but "I don't remember what happened to it." The purpose of that trip was wholly unexplained and the testimony concerning the visit and the time and circumstances of the return trip varied widely. Those who testified that the note had been displayed to them by Andrea stated variously that on its back it carried notations of "Paid in full" or "Paid," or both, "Cancelled," a red stamped cancellation, or two stamps (by one witness); all, however, testified that they saw something of that nature above what appeared to be Louis' signature; none paid any substantial attention to the face of the note, or were able to describe it.

There was much dispute as to whether payments had been made on this note. Five checks of the corporation for $200 each, payable to Louis, were received in evidence. Each of these had been marked by the corporation's accountant as "Note a/c" which,

it was agreed, meant "note account." These were dated December 22, 1954, and June 5, July 29, August 9 and October 25, 1955. The first check had borne a notation on its face "Payment on Note" and it was prepared in the office of Andrea's attorney; this notation had been torn from the check and, in turn, torn into seven little pieces. There was some attempted explanation of this, namely, that the checks were left on a desk in the outer office of Andrea's attorney, that a little boy was around and that these pieces were later found on the floor. Plaintiff lays great stress on this "mutilation." We do not attribute it to Andrea's counsel. Andrea denied that any payments were ever made on the note, stated that the first check was issued by mistake and that the others, along with three or more cash payments, were simply given to Louis by her because he needed or asked for money.

In rebuttal, evidence was received qualifiedly that Louis had discussed with his son Jack the $25,000 note and the payments thereon, the fact that it was delinquent, that the taxes were delinquent, and that he was going to find it necessary to foreclose. Evidence was similarly received that the note had been misplaced or lost in 1955, and that Louis and Jack had spent considerable time in searching the funeral home office and living quarters for it; also, that Louis had previously lost another valuable note. As is so often true in a court-tried case, the absence of specific objections to much of this evidence makes the record confusing. The court rejected a card record which plaintiff testified was his father's record of payments on this note; he also testified that this was in Louis' handwriting, that he saw it about the middle of 1955 and several times thereafter, that it was kept in Louis' card case, and that he found the card case in one of Louis' shoes after his death. The dates and amounts of these payments were read in evidence without objection prior to the offer of the card itself. Plaintiff also testified: that he had seen the compromise agreement with copies of the note and deed of trust attached, and that his father kept these in a suitcase; that he also saw the "note and mortgage," probably early in 1955 for the last time; that when he saw it, it was not marked paid; that Louis bought the first mortgage, borrowing at the bank on his insurance to do so; that Louis always carried at least $200–$300 in cash on his person and that he never indicated that he was "hard up." When asked on cross-examination why his father had not foreclosed on the motel before he died, he answered that: "he told me that Mrs. Andrea had promised him very definitely to make future payments, to make up the back payments, and to pay the back taxes, and that he was going to give her another chance."

The trial court made detailed and meticulous findings. Space permits us to mention only the most substantive of them. It found: that Louis was at all times the owner of the corporate stock until the compromise settlement was made on November 1, 1954; that prior to that time Andrea's only interest or connection was that of an employee, and that she had been discharged in July 1952; that an animosity had then developed which continued thereafter; that the compromise settlement represented the true intent of the parties, and that Louis did not knowingly enter into the supposed "secret" agreement; that the $25,000 note remained at all times the property of Louis and became a part of his estate, and that he did not assign it or knowingly surrender possession or ownership thereof to Andrea or any other person, or mark it "paid" or "cancelled"; that Andrea came into possession of the note and deed of trust by fraudulent and unlawful means and fraudulently procured its cancellation and the release of the deed of trust when she had no title thereto or interest therein; that Andrea, to promote her fraudulent purpose, failed to produce the note and that her testimony about the note being lost was not worthy of belief; that at no time did Louis intend to make a gift to Andrea of the note, or knowingly deliver it as a gift, and that her claim of a gift is fraudulent and fictitious.

The court found that $23,400, with interest, was due on the note, rendered judgment therefor, ordered the cancellation of the note annulled, the release of the deed of trust annulled, and the deed of trust foreclosed. It is obvious from the foregoing that the trial court disbelieved all the substantive testimony of Andrea and of Dr. Day.

At the trial and here there has been much argument as to what Andrea's defenses were and are. Those presented here are (1) an intentional cancellation and delivery of the note; and (2) the secret agreement based on consideration. Perhaps a gift is also argued, but rather obliquely.

We consider first the point that the court erred in admitting and considering hearsay and self-serving evidence. On the appeal of a court-tried case, we do not consider errors, as such, in the admission and exclusion of evidence. In arriving at our own findings and conclusions we consider only that evidence which was properly admissible. Hussey v. Robison, Mo., 285 S. W.2d 603. This point concerns conversations in which Louis stated that the payments on the note were delinquent and that he would have to foreclose, along with other incidental statements. The objection raising Section 491.010 RSMo 1949, V.A.M.S. (The Dead Man's Act) was inapplicable; plaintiff was not a party opposing a deceased party, but was himself the representative of the deceased party. However, giving to defendants the benefit of all objections, though somewhat difficult to follow, we think that most of this testimony should have been excluded as self-serving declarations, and we shall not consider that part. The record of payments kept by Louis stands in a slightly different category and the figures were read into evidence without objection; however, the entire meaning of this evidence depended upon self-serving statements, and the evidence should not be considered. This is also true of the evidence that the note had been misplaced. One other phase of the evidence was and is admissible. When counsel asked Jack on cross-examination why his father "didn't foreclose upon it before he passed away," he exceeded the scope of all the direct examination to which he had previously objected and thus put the answer into the case by his voluntary action. The answer was of Andrea's promise of payments, which, of course, tended to indicate Louis' ownership of the note. This was obviously referring to a statement made during the time when Andrea claims the note was on deposit with Dr. Day.

We regard the so-called "secret agreement" as wholly ineffective. At the time it was offered counsel stated that it was part of the res gestae. It meets none of the requirements of that rule, for it certainly was not such a spontaneous act or utterance as to exclude all idea of deliberation, premeditation or fabrication. State ex rel. Metropolitan Life Insurance Co. v. Shain, 343 Mo. 435, 121 S.W.2d 789. It is ambiguous and wholly incomplete as an instrument of settlement; it is inconsistent in some respects with Andrea's testimony. In both of the duplicate originals some alteration or erasure appears under the first part of the "Archard Louis" signature. It was and is dependent upon the oral testimony of Andrea and Day, which the trial court disbelieved. If recognized as genuine it might well constitute an attempt to make a testamentary disposition without the formalities of a will. On its face it was a pretense and a sham, concocted on the eve of pending settlement negotiations, and contradictory thereof. As a matter of law it was totally merged into and obliterated by the meticulous, formal and wholly integrated settlement documents, which the parties solemnly executed and swore that they understood. Indeed, Andrea testified that she knew "every word that is in there" (referring to the compromise settlement), but that the papers meant "nothing" (repeated many times) because of her surreptitious agreement with Louis. When parties reduce their negotiations and agreements into an integrated and unambiguous contract, all prior negotiations and agree-

ments are merged therein, and the final writing becomes the "single and final memorial of the understanding and intention of the parties." Commerce Trust Co. v. Watts, 360 Mo. 971, 231 S.W.2d 817, 820; Sol Abrahams & Son Construction Co. v. Osterholm, Mo.App., 136 S.W.2d 86; Grapette Co. v. Grapette Bottling Co., Mo. App., 286 S.W.2d 34; Kalberg v. Gilpin Co., Mo.App., 279 S.W.2d 177. Particularly is evidence of a prior inconsistent agreement precluded. Francis v. Saleeby, Mo. App., 282 S.W.2d 167. And a prior written agreement relating to the same subject matter is thus made inoperative. Restatement of the Law, Vol. 1, Contracts, § 237. This is not a rule of evidence, but one of substantive law. Andrea has raised no issue here of fraud, duress or mistake in the execution of the integrated compromise agreement. The cases cited by defendants on this point hold merely that equity should seek out and enforce equitable principles, that the dismissal of a suit may be a valid consideration for the release of a deed of trust, and that equity regards substance rather than form. Such cases do not reach our question. It would be unthinkable to allow parties thus to render ineffective in advance a solemn and formal agreement negotiated, approved and presented to them by their attorneys, documented by corporate action, and executed by them. We shall not permit it here. The "secret agreement" was and is of no legal effect.

The only question remaining is whether Louis, after the compromise agreement was executed, intentionally cancelled and effectively delivered the note to or for the benefit of Andrea. For our purposes it makes no difference whether we consider the question as one of gift or merely as a statutory discharge by intentional cancellation under Section 401.119 RSMo 1949, V.A.M.S. We have determined that there was no such cancellation or gift. It is true that plaintiff had the burden of proving that Andrea was not the lawful assignee and holder of the note and that the cancellation and release

was therefore fraudulent. Fraud must be proven by evidence that is definite and convincing, Tobin v. Wood, Mo., 159 S.W. 2d 287, or, as is often said, by evidence that is clear, cogent and convincing. Herrold v. Hart, Mo., 290 S.W.2d 49; Basman v. Frank, Mo., 250 S.W.2d 989; and the same degree of proof is required, generally, for the cancellation of deeds and similar instruments. Houghton v. West, Mo., 305 S.W.2d 407; Hudspeth v. Zorn, Mo., 292 S.W.2d 271. Essentially, the fraud alleged and required here consists merely of proof of the fact that Andrea presented and cancelled the note when she was not in fact the owner and holder. The cases cited by defendants deal largely with the burden of proof and the degree of proof required in cancellation cases generally; one (Spaeth v. Larkin, Mo., 325 S.W.2d 767) holds that a free and voluntary conveyance of real estate by a competent person is valid between the parties without consideration. We note also that fraud may be proven by circumstantial evidence and that a concurrence of "badges of fraud" may warrant an inference of fraud, although each such circumstance may, in itself, be trivial. Herrold v. Hart, Mo., 290 S.W.2d 49, 55; Castorina v. Herrmann, 340 Mo. 1026, 104 S.W.2d 297, 302; Matz v. Miami Club Restaurant, Mo.App., 108 S.W.2d 975, 979. These opinions discuss the nature of so-called "badges of fraud," or indicia of fraudulent conduct. The evidence of fraud may be gleaned from the testimony of a defendant, as well as from that of plaintiff. Castorina, supra; Conrad v. Diehl, 344 Mo. 811, 129 S.W.2d 870, 877. In such a case as this, we review the record de novo arriving at our own findings and conclusions, but usually deferring to the findings of the chancellor, especially where the credibility of witnesses is involved. Meyer v. Schaub, 364 Mo. 711, 266 S.W.2d 620; Houghton v. West, Mo., 305 S.W.2d 407. In fact, it has been said that we defer to the chancellor's findings in such a case, except where convinced that such findings are against the weight of the evidence. Meyer, supra;

Houghton, supra; Been v. Jolly, Mo., 247 S.W.2d 840, 853.

We move to a consideration of the evidence. Plaintiff made a prima facie case by proving the compromise agreement, the execution of the note and deed of trust, the making of payments thereon, Louis' possession of the note uncancelled in 1955, his financial, personal, physical and domestic circumstances, the absence of any record of payment of the note, Louis' purchase of the first mortgage, the mutilation of one check issued as a payment on the note, and the failure of defendant to produce the original note or give it to her attorney. Considering the evidence as a whole, we concur in the trial court's disbelief of the testimony of Andrea and Day. In so far as various other witnesses testified that Andrea showed them the note after Louis' death, with varied and sundry notations of payment or cancellation and a purported signature of Louis, that much may be true. Andrea had undoubtedly acquired possession of the note; but their parrot-like harping on the "Paid-in-full" idea, with little or no knowledge of what else they saw, lends slight credence or substance to their testimony or to defendants' cause. In a case of this type, much of the evidence from which fraud is inferred must come from defendants' case. The features which we see here as "badges of fraud" include the following: the secrecy and surreptitiousness with which this very unusual transaction was handled; the denial by Andrea that she made any payments on the note when her own accountant entered five checks in the "note account"; the unreasonableness of Andrea's claim that she gave substantial sums of money to Louis on various and sundry occasions, but *not* as note payments, while Louis was a member of a substantial business partnership from which he drew $10,848 in approximately the last ten months of his life, and while his wife and son were also drawing very substantial amounts therefrom; the unreasonableness of the claim that Louis knowingly cancelled this note

which he received only after a long period of quarrels, violence and litigation, and during a time when he was reconciled with, and living with, his wife; the keeping by Andrea of Louis' watch, ring and money, requiring proceedings in the Probate Court; the ostentatious display by Andrea of the "Paid" note to so many intimates and relatives and the carrying of it around so promiscuously, while wholly failing to give it to her attorney even after this suit was filed; the mutilation of the check of December 22, 1954, by tearing off the "payment on note" notation; the existence of very apparent erasures or alterations under Louis' supposed signature on both duplicate originals of the "secret agreement"; the susceptibility of Louis to fraudulent dealings because of his seriously impaired physical condition and his excessive drinking; the various inconsistencies and contradictions in details between Andrea and her witnesses and between the witnesses themselves; the withholding of all claims of ownership or gift until after the death of Louis; and, perhaps most important of all, the ambiguous and evasive testimony of Andrea about the supposed loss of the note on the somewhat mysterious and unexplained trip to Sedalia, and her consequent failure to bring it out into the light of day for examination. We conclude and hold that plaintiff has proved by clear, cogent and convincing evidence Louis' ownership of the note, the fact that Andrea was never the lawful holder, assignee or owner thereof, and that the cancellation of the note and the release of the deed of trust were fraudulent.

No point has been briefed here on the form of the judgment. The court annulled and set aside the cancellation of the note and the release of the deed of trust, rendered judgment for the balance due on the note with interest, ordered the Trustee named in the deed of trust to sell the property and disburse the proceeds in accordance with its terms, and ordered that any residue of the debt should be levied on other goods, chattels, lands and

tenements of defendants. Our statutory proceedings for foreclosure by suit (Sections 443.190–443.280, inclusive, RSMo 1949, V.A.M.S.) are held to be actions at law. Northern Finance Corp. v. Forked Leaf White Oak Lumber Co., Mo.App., 262 S.W. 437; Nodaway County v. Alumbaugh, 348 Mo. 354, 153 S.W.2d 74; Hays v. Dow, 237 Mo.App., 1, 166 S.W.2d 309; McCauley v. Brady, 123 Mo.App. 558, 100 S.W. 541. But these statutes are not exclusive, and where the suit is equitable in nature the foreclosure may be had in equity. Northern Finance, supra; Nodaway County, supra; State ex rel. Wyandotte Lodge No. 35, I. O. O. F. v. Evans, 176 Mo. 310, 75 S.W. 914. The suit here was clearly equitable, for it sought to set aside the cancellation of the note and the release of the deed of trust. Having acquired jurisdiction, the court of equity might grant complete relief. Nodaway County, supra. Under these circumstances we find it unnecessary to decide whether the procedure followed was precisely correct in an equitable foreclosure. See, generally, the cases cited above.

The judgment will be affirmed. It is so ordered.

All concur.