**Richard A. ERICKSON, Appellant,**

v.

**CIVIC PLAZA NATIONAL BANK OF KANSAS CITY, a Banking Corporation, Alexander J. Barket and Charles A. Truitt, Respondents.**

No. 24774.

Kansas City Court of Appeals.
Missouri.
Dec. 4, 1967.

Charles V. Garnett, Kansas City, for appellant.

Levy & Craig, Bernard D. Craig, Paul Margolis, Jr., Kansas City, for respondents.

CHARLES SHANGLER, Special Judge.

Plaintiff Richard A. Erickson brings suit in equity against the Civic Plaza National Bank, Alexander J. Barket and Charles A. Truitt, as principal officers of that bank, for specific performance to compel delivery to plaintiff of 100 shares of the capital stock of defendant Civic Plaza National Bank. The issues were tried to the court, which duly entered its findings of fact, conclusions of law and denied plaintiff that relief. On this appeal, the court will review the entire record, make its own determination as to the facts, decide the weight and value to be given the evidence, deferring, however, to the findings of the trial court whenever appropriate. Tinnon v. Tanksley, Mo.Sup., 408 S.W.2d 98.

The basic legal issue presented to the trial court and to be determined de novo on this appeal is whether one Philip J. Close was authorized to enter into a contract for the sale to plaintiff of 100 shares of the capital stock of defendant Civic Plaza National Bank, then in the process of organizing. As the determination of that question involves the priority of events, we shall describe them chronologically rather than in the sequence in which they were presented at the trial.

Plaintiff's evidence consisted of certain deposition testimony of defendants Bar-

ket and Truitt and answers to interrogatories made by defendant Barket, all of which were received as admissions against interest. Defendant Truitt was examined as an adverse witness and plaintiff Erickson testified on his own behalf. Defendants offered the testimony of defendant Barket and Paul Ross, Regional Administrator of National Banks, Tenth National Bank Region.

Defendant Barket, having conceived the idea of organizing a national bank, employed Philip J. Close on about February 20, 1962. Close, a lawyer with banking experience, was employed, according to Barket, to perform legal work in connection with obtaining a charter for the proposed Civic Plaza National Bank. During that month, Close visited defendant Truitt on a different matter and mentioned to him the proposal to organize the new bank. Thereafter, Truitt, in the company of Close, visited Barket. Truitt became an organizer of the bank, eventually becoming the owner of 70 shares of its capital stock. From April 29, 1963 to April, 1965, Truitt served as President of the bank.

On March 30, 1962, Application to Organize a National Bank was filed with the Comptroller of the Currency of the United States. Mr. Paul Ross was the Regional Administrator for National Banks and his Kansas City office received the actual filing of the application and processed it. It was signed by eight persons as organizers, among them the defendants Barket and Truitt. Mr. Erickson was not a signatory. The application recited that the proposed bank was to have a capital of 50,000 shares of the par value of $20.00 per share, a surplus of $350,000.00 and undivided profits of $150,000.00, for a total capitalization of $1,500,000.00. Thus, the gross value of each share was $30.00. Barket and his family became owners of 46,000 of the shares. By March 30, 1962, the date the application was filed, all of the 50,000 shares as authorized had been fully subscribed.

On April 9, 1962, a news article appeared in the Kansas City Star, titled "Seek Charter for New Bank" (Plaintiff's Exhibit 1). It contained a description of the proposed location, capitalization and organization of the defendant bank. The names of the organizers and members of the board of directors were listed, among whom were defendants Barket and Truitt. Also listed as organizers and members of the board were Dan T. McKeever and Alfred C. McWhirter, both of whom were personally known to plaintiff Erickson. The article had been prepared by Close and discussed with defendant Truitt prior to its publication. It described Close as "attorney for the group of incorporators." All of the significant events which we relate hereafter had their genesis in this publication.

Plaintiff Erickson read the article. As it happened, plaintiff, a practicing lawyer, and Close, also a lawyer, were acquaintances of long standing and occupied offices in the same building. Within two days after the article appeared, Erickson encountered Close in the lobby of their office building, made inquiry of him as to whether he was acting for the organizing group and manifested interest in purchasing some bank stock as an investment.

On May 7, 1962, plaintiff Erickson executed his check in the sum of $3150.00 payable to "Phil J. Close, Attorney" (Plaintiff's Exhibit 3). The endorsement on its reverse side reads: "Phil J. Close, Attorney, for deposit." It was identified by plaintiff as Close's signature.

Later, plaintiff received from Close a "Receipt & Agreement" (Plaintiff's Exhibit 4), dated May 14, 1962, which acknowledged the $3150.00 as payment for 100 shares of the capital stock of Civic Plaza National Bank, to be delivered "when issuance thereof is authorized by the Comptroller of the Currency." It was "approved" by plaintiff's signature.

On July 24, 1962, the preliminary application submitted by the organizers was

approved. The significance of this approval does not appear in the record.

As best as we are able to discern from the record, on September 7, 1962, Close and Barket were in New York in the office of a Mr. Emmet. Emmet's role in this affair was not fully drawn. Defendant Barket described him as "a man of substance," "a free lance individual," "not an investment banker"; otherwise, Emmet remains a shadowy figure in this narrative. On September 20, 1962, Barket returned to Emmet's office with his attorney, Mr. Craig. According to Barket, these trips to Emmet's office in New York were prompted by information having come to his attention; "rumors were coming back to me and I wanted to quash them and straighten them out" * * * "people asked me if he (Close) was authorized and I said 'no'". Barket denied that his dispute with Close concerned fees as he had been paid $9500.00 in fees and was advanced an additional $2500.00 as a personal loan. Barket gave Close "preliminary notice" of his discharge on September 7, 1962, while both were in New York, but the actual discharge occurred on September 13, 1962 and was confirmed by letter of October 10, 1962 (Plaintiff's Exhibits 5 and 6). Truitt advanced as the reason for Close's discharge that the organizers were not content with the manner in which he was conducting the continuation of the charter after the preliminary application was approved.

Sometime after Close's discharge, either during September or October of 1962, he consulted with plaintiff Erickson who is, it is to be recalled, a practicing attorney. Erickson telephoned Barket about the alleged attorney's fee owing Close. Barket denies that Erickson, during that telephone conversation, mentioned the 100 shares of stock for which he now makes claim. Barket insists he and the bank first learned of this claim for the first time when plaintiff's attorney's letter under date of February 25, 1964 was received by the defendants. As the result of that telephone call, Erickson, Close and Barket met in the office of Barket's attorneys.

At this meeting, Erickson testified he became aware of the Manuel affair when he saw a receipt and check substantially in the form of the check and receipt involved in his transaction with Close. He observed: "It looked exactly like the deal I had with Close."

The attorneys for George B. Manuel, by letter of November 5, 1962 (Plaintiff's Exhibit 7), had made demand upon the Civic Plaza National Bank for reimbursement to him of $3150 which Close had received in payment for 100 shares of the bank's stock. This stock subscription was taken from Manuel by Close on August 20 or 21, 1962. Barket acknowledged having made full restitution to Manuel and gave as his reason he was advised to do so by Mr. Ross, Regional Administrator of National Banks, so that the issuance of the bank charter would not be impaired. Mr. Ross confirmed having made that recommendation.

On April 27, 1963, the final charter was issued to the defendant bank. Prior to its issue, the total of $1,500,000.00 had been paid in by the organizers and deposited in the First National Bank of Boston. Also, each subscriber and organizer had been interviewed by Mr. Ross to determine the extent of ownership by each of the bank's stock and to inquire into their financial responsibility. Plaintiff Erickson was not one of them. Close died on November 5, 1963. On February 25, 1964, plaintiff Erickson, by his attorney, made demand on defendant bank to issue him the 100 shares of stock which is the subject of this suit.

Was Close authorized by any of the defendants to contract with plaintiff for the sale to him of 100 shares of the capital stock of the defendant bank? The answer to that basic question necessarily requires a definition of the relationship which subsisted between Close and the organizers, and particularly defendants Barket and Truitt. Was that relationship attorney and client,

or something more? Or was Close the agent for the organizers for such purposes and under such circumstances as would have led a person of ordinary prudence to believe Close possessed authority to contract for stock subscriptions? These questions are more than simply didactic.

The creation of the attorney-client relationship "is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession." 7 Am.Jur.2d, Attorneys at Law, page 105. The relationship, "in a limited and dignified sense" is essentially that of principal and agent. Schwarze v. May Department Stores, Mo.App., 360 S.W.2d 336; Henderson v. Cape Trading Co., 316 Mo. 384, 289 S.W. 332. Two concomitants of the agency arising from the attorney-client relationship distinguish it from many other types of agency. Firstly, is the limit of its scope and particularly where an attorney is employed for a definite purpose not involving litigation in court, as in the case before us.

"Hence the employment of an attorney at law to advise a client in regard to questions of law which may arise in a business transaction, or to handle legal matters, gives the attorney no authority to transact the business of the client generally, or his business in the particular transaction, *except as the attorney is specifically authorized to act.*" 7 C.J.S., Attorney and Client § 101, page 923. (Emphasis supplied.)

Secondly, a privilege attends the attorney-client relationship, distinguishing it from many other forms of agency. When the client has committed his affairs to an attorney for his advice thereon, communications between them made in confidence, are privileged against disclosure. Section 491.060(3), R.S.Mo., 1959; Bussen v. Del Commune, Mo.App., 239 Mo.App. 859, 199 S.W.2d 13.

The record evidence convinces us that the relationship of attorney and client was established between Close, Barket, Truitt and the organizers. Close, who was both a lawyer and a banker, was hired by defendant Barket to perform legal services necessary to obtain a national bank charter. There is nothing in the record to indicate that Close was not hired for at least that purpose. His period of actual employment was from February 20, 1962 until September, 1962 and he was paid $9500.00 for his services. The preliminary application for the charter was approved on July 24, 1962. The news item of April 9, 1962, which appeared in the Kansas City Star, authored by Close, himself, and approved by defendant Truitt described Close as "attorney for the group of incorporators." His duties included that of correspondent between the organizers and Comptroller of the Currency; as liaison between the two, he was required to maintain the documentation supporting the application for the new bank. Close's duties, manifestly, required some knowledge of the Federal laws pertaining to chartering national banks. The relationship between Close and the organizers contemplated the continuing need and use of Close's legal services. The chartering of the bank, therefore, was committed to Close, an attorney. "A matter committed to a professional legal adviser is *prima facie so committed for the sake of legal advice* which may be more or less desirable for some aspect of the matter. * * *" (Emphasis supplied.) Wigmore, On Evidence, Volume VIII, McNaughton Revision, Sec. 2296, page 567.

Did Close, in his capacity as attorney for defendants Barket, Truitt and other organizers, have authority to enter into the subscription contract in issue? We believe he did not. There was no evidence which warrants the inference or conclusion that Close was authorized to contract on behalf of his clients. It was not contemplated as among his legal duties, nor was it within the scope of his author-

ity. "The mere existence of the relationship of attorney and client is not sufficient proof to establish the authority of the attorney to act for his client in the making of a contract." Dyer v. Union Electric Company, Mo.App., 318 S.W.2d 401. Nor does an attorney have any implied power "to bind his client by an agreement collateral to and independent of the subject matter of his employment," 7 C.J.S. Attorney and Client § 103, page 925. A very instructive discussion of this subject is found in Robinson v. DeWeese, Mo.App., 379 S.W.2d 831, dealing, as well, with the powers of an attorney in the conduct of litigation.

■■■■ If plaintiff's contention that Close was authorized to contract for the stock subscription on behalf of the organizers is to be established, therefore, it must be premised on something other than the attorney-client relationship. Plaintiff complains, however, that the trial court denied him the right to probe into the purpose of Close's employment. If allowed, he maintains, such inquiry would have permitted him to determine whether services other than purely legal were contemplated as part of Close's employment. During the course of the trial, plaintiff undertook to question defendants Barket and Truitt concerning transactions and communications between them and Close. Defendants objected to many of these questions on the ground that they called for information not subject to disclosure under the attorney-client privilege. Of course, confidential communications between attorney and client, in the discharge of his duty to his client are privileged, Ex parte Schneider, Mo.App., 294 S.W. 736. The privilege belongs to the client, Canty v. Halpin, 294 Mo. 96, 242 S.W. 94; Ex parte Schneider, supra. Whether a communication is privileged, of course, is one for the court. Heald v. Erganian, Mo.Sup., 377 S.W.2d 431. It is also clear that the mere relation of attorney and client does not raise a presumption of confidentiality; Wigmore, op. cit., Volume VIII, pages 599, 600.

■■■■ We do not undertake to review all of the trial chancellor's rulings on the evidence as they relate to the attorney-client privilege or other areas. We have the whole record of this equity trial before us and we will consider only such evidence as we deem admissible and reach our judgment on the competent evidence offered without regard to the trial court's rulings. Middleton v. Reece et al., Mo.Sup., 236 S.W.2d 335; Hussey v. Robinson, Mo.Sup., 285 S.W.2d 603; Louis v. Andrea, Mo. Sup., 338 S.W.2d 96.

Plaintiff's most pointed and insistent complaint is that the trial court refused to permit him to question Barket concerning Close's employment. Plaintiff contends Close was actually and primarily employed to promote the budding bank, and that his employment as an attorney was merely incidental to that larger purpose. With respect to this contention, we have scrutinized the record with scrupulous care and it discloses as follows: Prior to trial, plaintiff took the depositions of defendants Barket and Truitt. During those examinations, certain questions were asked which defendants, upon advice of counsel, declined to answer on the basis that they were privileged communications between attorney and client. Among those questions is the one of which plaintiff particularly complains: "Wasn't he (Close) also employed to assist you in promoting this enterprise?" These questions were thereupon certified to the trial court for ruling, and among them was the question noted. That question appeared on page 19 of the deposition transcript. On the morning of the trial the court took up plaintiff's Motion to Require Answer to Certified Questions. With respect to the question in issue, the record reveals:

"THE COURT: And on page 19, lines 15 to 19, inquiring directly to the purpose of employment of Mr. Close, it is sustained. They should answer the question."

During the actual trial, and during plaintiff's reading of portions of the deposition

testimony of defendant Barket as admissions against interest, the following colloquy took place (the subject of the deposition excerpts so offered was the nature of Close's employment):

"MR. GARNETT: * * * I want to know whether or not Your Honor is permitting me to read at the bottom of page 12 and page 13 down to the 14th line?

"THE COURT: The court ruled in chambers. The purpose of employment may be inquired into and you may continue and the objection will be overruled."

The trial court's rulings were clear and unambiguous. Plaintiff, although authorized by the court to do so, simply failed to pursue the subject of the purpose of Close's employment. As this record stands, therefore, there is no evidence that Close was employed in any other capacity or for any other purpose than that of legal adviser to defendants Barket, Truitt and other organizers.

We have already determined that Close had no actual or express authority as attorney to bind his clients to the stock subscription agreement between Close and Erickson. Had these defendants, however, placed Close in such a position that a person "in the exercise of reasonable prudence" would be led to believe Close possessed the requisite authority to contract for the stock subscription, and would be justified, in good faith, in dealing with Close as defendants' agent for that purpose? Kuraner v. Columbia National Bank of Kansas City, 230 Mo.App. 358, 90 S.W. 2d 465, at 471. Plaintiff does not seriously contend Close had express or implied authority to do so, rather, as appears from his brief, "plaintiff at all times insisted that the controlling law of this case is whether or not Close had apparent authority, that is whether or not a prudent person would have dealt with Close under the circumstances of this record."

Although the term "apparent authority" has been variously defined, Mechem, The Law of Agency, Book II, Section 720, the Missouri rule is stated in Koewing v. Greene County Building & Loan Ass'n of Springfield et al., 327 Mo. 680, 38 S.W.2d 40 at page 43:

"* * * The rule that a principal is bound by acts of his agent within the apparent scope of the agent's authority is thus stated in Johnston v. Milwaukee & Wyoming Inv. Co., 46 Neb. 480, 64 N.W. 1100, 1102: 'That where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence, conversant with business usages and the nature of the particular business, is justified in presuming that such agent has authority to perform on behalf of his principal a particular act, such particular act having been performed, the principal is estopped, as against such innocent third person, from denying the agent's authority to perform it'."

See also Kuraner v. Columbia National Bank of Kansas City, 230 Mo.App. 358, 90 S.W.2d 465; Thornhill v. Masucci, 202 Mo.App. 357, 216 S.W. 819; J. A. Fay & Egan Co. v. Brown Machinery Co., Mo. App., 14 S.W.2d 491. Note, also, the somewhat varied emphases in the definitions of apparent authority found in these decisions.

A third person dealing with an agent, however, has the duty of ascertaining for himself, the agent's authority. The law indulges no presumption that agency exists. Rosser v. Standard Mill Company, Mo.Sup., 312 S.W.2d 106. Under this rule,

"* * * the person dealing with an alleged agent is bound to ascertain * * * (1) that the alleged agent is really such, (2) that he is an agent of the sort he purports to be * * * and (3) that the act done is within the limits of his authority. * * *" Mechem, The Law of Agency, Book II, Section 745, page 528.

The Missouri rule is in accord. Wyler Watch Agency v. Hooker Jewelry Co., Mo. App., 280 S.W.2d 849.

We have studied the record faithfully and fail to find any evidentiary basis for making out an apparent authority by Close to bind defendants to the stock subscription contract with plaintiff. We find no facts which would have justified plaintiff to presume that Close had any such authority, according to the criterion enunciated in Koewing, supra, and stated above. Plaintiff made an offer of proof, properly rejected by the trial court, that plaintiff met Close in the elevator of their building in May of 1962 and then conversed with him in Close's office. Close at that time acknowledged Erickson's previous expression of interest in purchasing some bank stock and told him there might be some stock available within a few days. Close told him he had met with the organizers and that "they intended to have a meeting to make decisions on these questions." On May 7, 1962, Close came to plaintiff's office and "he said that there would be some stock available and that I could write my check for it." To the extent that this evidence was offered to establish Close's authority to take the stock subscription from plaintiff, it is incompetent. An agency cannot be created by the mere declarations of the person assuming to act as agent; there must be independent evidence of agency to give such declarations any probative force. Mechanic's-American National Bank of St. Louis v. Rowell, Mo.Sup., 182 S.W. 989. No independent evidence was adduced that defendants knew of such a declaration by Close of his authority in that respect, nor that such conduct was so often repeated by Close as to warrant us to imply the principals' knowledge of it. Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751.

There was evidence that George B. Manuel had paid Close $3150.00 for 100 shares of stock in the defendant bank. The transaction, according to the letter of Manuel's attorney to the bank, occurred in August, 1962. There is no evidence that the defendants had any knowledge of it prior to November 5, 1962, the date the letter issued. The date of plaintiff's check to Close for the 100 shares was May 7, 1962. The date of the "Receipt and Agreement" between Close and plaintiff was May 14, 1962. Close's apparent authority with respect to the Erickson transaction cannot be predicated upon the Manuel transaction because it occurred prior and cannot be said to have been induced by it.

"Agency by estoppel, or by claim of apparent authority, can only be predicated on facts known or appearances shown at the time of the transaction, for they cannot otherwise be said to have *induced* it; knowledge subsequently acquired is irrelevant. (Citation)" Dierks & Sons Lumber Company v. Morris, Mo.App., 404 S.W.2d 229, at p. 232.

The evidence concerning Close's activities in New York, particularly with respect to Mr. Emmet, was completely inconclusive. That could have had no bearing on the question of apparent authority, as such were not "facts known or appearances shown" at the time of the transaction. The numerous authorities plaintiff cites on the question of apparent authority correctly state the law as we know it. There was simply a failure of proof that defendants Barket and Truitt held Close out as their agent for stock subscriptions or that these defendants' "habits and course of dealing (had) been such as to reasonably warrant the presumption that (Close) was (their) agent, authorized to act in that capacity * * *." Haubelt Brothers v. Rea & Page Mill Co., 77 Mo.App. 672, 679. Close's apparent authority to transact the stock agreement with plaintiff was not proved.

In any event, plaintiff Erickson, although it was his duty to do so, made no effort to ascertain whether Close's alleged agency was such as plaintiff assumed it to be or

that the sale of the stock was within the limits of his authority as agent. Wyler Watch v. Hooker Jewelry Co., supra. The Kansas City Star article of April 9, 1962 mentioned Mr. McKeever and Mr. Mc-Whirter as incorporators of the bank. Plaintiff knew them both personally, knew that they were incorporators, yet admittedly made no attempt to inquire of them as to Close's status or authority to act in such a manner on behalf of the incorporators of the proposed bank. Had he done so, he would have learned that all of the stock had been fully subscribed by March 30, 1962, some forty-five days prior to his own stock agreement. When asked why he had not inquired of them, plaintiff replied: "No, I did not see any reason to, and I didn't because in the thirty years of practicing law I have never questioned the authority of an attorney to represent his client." We have already discussed the limited scope of the attorney's agency under these circumstances and will not repeat that discussion. Also, when asked why he waited until February 25, 1964 to make demand upon the bank for the stock, plaintiff replied: "Well, I am very busy * * * and I have a lot of things to do, and I can't be running around following through on these matters just immediately when they happen." Erickson's check for the stock was made payable to Close, endorsed by him and deposited in his own account. All these facts were known to plaintiff, yet they never gave him pause to question Close's pretended authority. It is not necessary for us to go into all of the evidence on this point. We conclude that had plaintiff made those inquiries required of him by law, he would have discovered that Close had neither apparent nor any other kind of authority to contract with plaintiff for the sale of the corporation stock.

Finally, plaintiff argues that because of defendants' claim of privilege, plaintiff was denied information concerning Close's activities relating to his authority. That evidence, he says, was peculiarly within defendants' possession and their failure to adduce it or permit it to be adduced gives rise to the inference that such evidence would have been unfavorable. Plaintiff's burden in this suit for specific performance is to have established the agreement as that of the defendants' by clear, cogent and convincing evidence. Missouri Digest, Specific Performance, ⚖121. This plaintiff failed to do even if we consider the inference as validly applicable to this record.

The trial chancellor sought and did equity. Sebree v. Rosen, Mo.Sup., 349 S.W.2d 865. We affirm his ruling.

HOWARD, P. J., and CROSS, J., concur.

MORGAN, J., not participating because not a member of the court when the cause is submitted.