In the Matter of JOHN R. OLIVER, Respondent, No. 44549—285 S. W. (2d) 648.

Court en Banc, January 9, 1956.

C. A. *Grassmuck, Jr.,* for respondent John R. Oliver.

[648] DALTON, J.—This is an original proceeding based upon an information filed in this court by the Bar Committee of the Eighth Judicial Circuit of Missouri. The information charged respondent, a duly licensed attorney at law and a member of the bar of this state, with certain acts of professional misconduct as therein specified, alleged that he was an unfit person to practice law in this state and prayed the court to appoint a special commissioner to take testimony and report his findings and conclusions to the court, and that the court enter its decree permanently disbarring respondent from the practice of law.

A citation was duly issued and served and respondent's answer to the citation was duly filed. Thereafter, Hon. Roy B. Meriwether, Judge of the Tenth Judicial Circuit of Missouri, was appointed special commissioner of this court to hear the testimony and report, as stated. He accepted the appointment, qualified, heard the testimony and reported his findings of fact and conclusions of law, together with his recommendation that respondent be permanently disbarred from the practice of law. Respondent was represented by counsel and [649] present at the hearing and testified in his own behalf, but filed no exceptions to the report of the special commissioner and he has filed no pleadings, suggestions or brief in this court. Informants filed a motion asking the court to approve and follow the recommendations of the special commissioner, which motion was ordered to be taken with the case. The cause was finally submitted in this court on September 28, 1955 on the record and brief of informants.

The charges against respondent were based upon his alleged disposition of certain moneys received by him in the settlement of a client's claim. Many facts are not in dispute. Walter Jones and Annie Jones were husband and wife. Walter had been employed in St. Louis for some sixteen years. For many years he had been a porter in Matt Cicerich's tavern or saloon in the Laclede Hotel at Sixth and Chestnut in the city of St. Louis. Annie was employed as a maid in a home in Memphis, Tennessee. On or about March 28, 1952, Walter died as a result of an automobile accident and Annie came to St. Louis to attend the coroner's inquest and the funeral of her husband. She there met Matt Cicerich, who introduced her to respondent and recommended his employment as her attorney to prosecute her claim for the wrongful death of her husband. Respondent was so employed by a written contract dated March 31, 1952 and providing a contingent fee of one-third the amount recovered. Respondent subsequently effected a settlement of Annie's claim for $8,000. Thereafter releases were executed and the net proceeds of the settlement were received by respondent and deposited in his personal checking account in a St. Louis bank. On or about December 18, 1952, respondent sent his personal check for $1,000 to his client in Memphis, Tennessee, and advised her "I will send more to you in the next thirty days. I have had to pay out a lot on proven claims filed. I paid Mr. Cicerich the funeral bill and bill for moneys that he advanced to me for this prosecution, and I will send you an accounting as soon as I can." Prompt demand, as hereinafter stated, was made for the balance claimed to be due Annie Jones, but no further accounting was made until February 10, 1953, when respondent mailed her his personal check for $2.69 and a statement purporting to show the disposition made of the remaining proceeds of the settlement. The statement showed the payment of $1,000 to Annie on December 18, 1952, the payment of respondent's fee of $2666.66, a payment to Matt

Cicerich of $457, being the amount he is alleged to have advanced and paid to one E. B. Koonce for the funeral and burial of Annie's husband (an item which Annie had agreed to and understood was to be paid from the fund), and the payment of certain minor items of costs and taxes. Other items listed in the statement and purporting to account for the balance of the proceeds of the settlement will be subsequently discussed.

With reference to the disposition of this balance of the net proceeds of the settlement, the information charged: "That respondent did, during the months of December, 1952, and January, 1953, without notice to client or any consultation with client, undertake to divest himself of immediate possession of client's remaining money and divert the same from client, and did issue respondent's checks on his bank account in St. Louis, where he had deposited the funds of his client derived from the settlement of the case as aforesaid, until he had issued and permitted to be cashed, or had cashed, a number of checks, and made some cash payments for alleged court costs, to various people, as the operator and his brother of a tavern or saloon in the City of St. Louis, the bar tender of the saloon, the bar maid of the place, respondent himself, and others, on their mere alleged unproved and unverified and most questionable and apparent nonexistent claims that they had loaned money to the deceased husband in his life-time, until there remained in respondent's account at the bank out of client's funds received only the sum heretofore mentioned of $2.69, which as aforesaid respondent sent to his client in February, 1953, with a notation on his check: 'Bal. due Annie Jones on Power of Attorney signed April, [650] 1952', * * *. That the same was done by respondent by collusive or other improper arrangement with the persons receiving such checks in an effort to try to deprive client of her money that was due her and for the benefit and enrichment of respondent, * * *. That respondent did falsely represent to his client that he had paid out large sums of her money to others when in truth and in fact he retained the money himself and failed to disclose to his client that he had done so; that respondent did thus misappropriate the money of his client and fail to properly account to his client for her money, contrary to his professional duties to his client, and contrary to the spirit and rules of the Supreme Court of Missouri, as expressed in the preamble to Rule 4 of this Court and particularly as expressed in Rules 4.47, 4.32, 4.15 and 4.06 of this Court."

With reference to these charges, the special commissioner found respondent "guilty as charged in the information"; and particularly found that "the truth of all of the allegations of said information have been definitely proven and established by the great weight and abundance of credible testimony produced in evidence."

In his report of his findings as to particular facts, the special commissioner found that Annie Jones, widow of Walter Jones, deceased, by written contract, dated March 31, 1952, voluntarily employed respondent to represent her "in the litigation of any and all claims that have arisen or may arise" by reason of the death of her husband in an automobile collision in the city of St. Louis; that respondent's contingent fee was to be one-third of the amount collected; that Annie Jones further signed Exhibit "B", dated March 30, 1952, by which she purported to voluntarily waive any and all rights under the statutes and laws of Missouri relating to the "Death Benefits" received by her for the wrongful death of her husband and to authorize the payment of all his just and legal debts from the amount she received; that she also signed Exhibit "C", dated April 3, 1952, being a Power of Attorney to respondent to collect any and all damages and disperse same according to all legal and bona fide claims against her late husband; that before Exhibits "B" and "C" or either of them were signed by Annie Jones, and as an inducement for her to sign the same, the said John R. Oliver fraudulently represented to her that it was necessary for her to sign the papers for him to employ an additional attorney to assist him in the prosecution of her lawsuit for the collection of damages for the death of her husband; "that said Annie Jones was and is an ignorant colored woman, 57 years of age, with no knowledge of business matters, scarcely able to read or write; that she did not read said documents at the time of signing same but relied fully upon the said John R. Oliver to know what she should sign in connection with her claim or suit; * * * that Oliver did not read the documents to her and she relied upon what he told her they were * * *; that the said John R. Oliver did then and there misrepresent to Annie Jones the real reason why (sic) the signing of informant's exhibits 'B' and 'C'; and that said fraud and deception on the part of said John R. Oliver was a part of a fraudulent plan to make available for his own use the funds to be received from the wrongful death of Walter Jones."

The special commissioner's report does not summarize the detailed facts shown by the record, but quotes testimony at length to support the conclusions reached. We shall review the facts found, supplementing them at times from the record, so that the commissioner's further findings and observations may be better understood.

On receipt of respondent's letter of December 18, 1952, Annie consulted an attorney in Memphis and respondent was contacted by telephone on December 24, 1952. A demand was made for the balance of the money due her. Respondent asked her attorney, "How much money does she want?" He further said that he had to settle some debts. Respondent was then advised that Annie knew of no debts except the funeral expenses of her husband. Respondent replied, "Well, it is the funeral bill and a hundred dollars" he had to pay

somebody. [651] Respondent insisted he was honor-bound to pay some debts, refused to fix a day for paying the balance and finally said he would pay the balance in about 30 days. Respondent said the balance would be about $3,000; that the total, including the $1,000 remitted, "won't go as much as $5,000." Not hearing further from respondent, an effort was made to contact him by telephone. When that failed, a telegram was sent and respondent later advised that a further report would be made about February 7, 1953. As stated, respondent's letter of February 10, 1953, contained a check for $2.69 and a statement purporting to show how the proceeds of the settlement had been disposed of. Among the items for which respondent took credit were the following: "5. To Matt Cicerich, money advanced to be paid in Court for fines 3-29-49—3-1-53, $1,475.00. 6. To Matt Cicerich, money loaned to Walter Jones for attorney fees 3-30-37—4-7-48, $1,400.00. * * * 8. To Mat Cicerich, money advanced to Walter Jones during 30 day period before he died, $218.00. 9. To John Cicerich, money loaned to Walter Jones paid Dec. 30th, 1952, 1948-49-50-51, $500.00. 10. To Cleo Canfield, barmaid at tavern where Walter Jones worked for Matt Cicerich, $200.00. 11. Charles Zirkel, bartender at same tavern, $25.00." The receipts filed in support of the above items were dated December 30, 1952, subsequent to the time that Annie's Memphis attorney had demanded for her the balance in respondent's hands and had advised respondent that she knew of no claims, except funeral expenses. Respondent's personal checks which purport to have been given in payment of items 5, 9 and 10 are dated December 30, 1952. The check in payment of item 8 is dated December 16, 1952. No checks were issued in payment of items 6 and 11.

Item 6 was purportedly supported by a receipt, dated December 30, 1952, as follows: "Received of John R. Oliver, Attorney in fact, $1,400.00, money advanced and loaned to Walter Jones for attorney fees, 3-20-37 to 4-7-48, $1,400," signed Matt Cicerich. The date in 1937 was several years before respondent was admitted to the bar. Respondent admitted that no check was issued or money paid to Matt Cicerich on this item. He said the $1,400 remained in his personal account and was checked out by him for personal benefit for personal items of expense. On cross-examination, he admitted the receipt was false; that Cicerich had advanced no money to Walter Jones; that respondent had not paid the money to Cicerich; that respondent received and directly appropriated the client's funds to the extent evidenced by the receipt; and that the true facts were not disclosed to his client. Respondent's attempted explanation was that he had known Walter Jones for more than ten years and had rendered him legal services during this period; that Matt Cicerich had guaranteed respondent's fees for such services; that Walter Jones had been arrested on about fifteen occasions for gambling and disturbance of

the peace; that respondent had represented him by appearing in chambers before the police judge; that he had made only two court appearances; and that he had represented Jones against collection agencies. He insisted that Matt Cicerich had told Annie that her husband owed respondent around $2,000 for legal services, which he (Cicerich) had guaranteed. Respondent said he (respondent) told Annie she did not have to pay his fee, but Annie insisted that he pay all of her husband's debts and he did so. On cross-examination respondent admitted that he had previously testified that he had represented Walter Jones thirty or forty times in ten years, mostly in police court.

There was testimony on behalf of informants that a careful check of the police records of arrests in the city of St. Louis, during the period between 1934 and 1952, showed that Annie's husband had been arrested only twice in that city, once in 1941, when he was represented by the public defender and entered a plea of guilty to a criminal offense, and once in 1951 when he was arrested for investigation. The records of the Bureau of Identification, where fingerprint records of all persons arrested are kept, also showed that Annie's husband, Walter Jones, had only been arrested [652] twice, once on February 21, 1941 and once on March 4, 1951.

Respondent testified that, after Annie returned to Memphis, he notified the places where her deceased husband had worked that he, respondent, had a power of attorney and that any claims they had against Walter Jones would be "entertained." He said Annie knew that Matt Cicerich claimed $3,000 due from her husband for money borrowed over a period of years while Walter was working for Matt; and that Matt had also told her that her husband owed his brother John some money. Annie denied knowledge of any of these claims, or of any authorization to pay them.

As to item 5, respondent said that after the $8,000 was collected, Matt Cicerich presented his claim to him and showed a handwritten account book and gave him the names of four persons that knew Matt had loaned cash to Walter Jones. Respondent said the claim was supported by the testimony of Pigg and Coleman, colored porters in the Laclede Hotel at Sixth and Chestnut in St. Louis, and by the testimony of Cleo Williams, a porter or bellhop at the Arlington Hotel and by one Murphy, the manager of the bar in the Laclede Hotel. Respondent said he questioned these witnesses about amounts and dates in Matt's book and they told stories of men coming in Matt's saloon and saying that they were going to kill Walter Jones if not paid and that Matt advanced $300 in money at different times to Walter Jones and Walter Jones paid the men off. Respondent claimed he had spent five nights of three hours each questioning the witnesses in the back of Matt's saloon as to the correctness of Matt's claim; that he checked the police court records in an effort to find out

what Walter Jones had done with the money he had borrowed; that he (respondent) found a long list of arrests of Walter Jones, some of which he knew about, also that bonds had been given and two fines assessed and paid; that he personally knew Walter had been arrested fifteen times; that the witnesses, Pigg and Colman, said Jones had told them before he died that he had not paid the account. Respondent said the witnesses satisfied him as to the correctness of Matt Cicerich's account book; and that he paid Matt Cicerich $1,475.00 and took a receipt showing "for fines and money loaned to Walter Jones from 3-29-49—3-1-52," and returned the account book to Matt. Informants' evidence tended to show that no fines had ever been assessed against Walter Jones (Annie's husband) either in the police court of the city of St. Louis, or in the Court of Criminal Correction.

As to item No. 8, the purported receipt attached to the statement sent Annie on February 10, 1953, read: "Received of John R. Oliver, Attorney in fact, $218.00, money loaned and advanced to Walter Jones over and above his salary during the last thirty days of his life, from March 1, 1952, $218.00 (signed) Matt Cicerich." As to this claim, respondent testified, that it was for money that Matt Cicerich had advanced to respondent to investigate three insurance policies on Walter Jones's life that Matt Cicerich had given to respondent for investigation. The advancement was after Jones was dead. No collections were made on any of these policies. Two of the policies had been cancelled out and one dropped. All were industrial policies and none named Annie Jones, as beneficiary. Respondent admitted that Matt Cicerich advanced no such funds to Walter Jones; that respondent rendered no service to Walter Jones; and that on March 31, 1952, after Walter Jones's death respondent gave Matt Cicerich a receipt for $138 advanced to him. Respondent said the $138 was paid to him by Cicerich after Jones's death and was a part of the $218 later paid to Matt Cicerich by respondent. Respondent through Matt actually received the entire $218 of Annie's money.

As to item No. 9. Respondent said that he never saw John Cicerich in connection with this claim; that the claim was mailed to him from some place in Texas; that he sent it back to be signed; that he telephoned to John Cicerich in Texas and asked about the claim and what it was for; and that he (respondent) then wrote on the claim, "To money loaned and advanced to [653] Walter Jones for which he promised to pay me about six months before his untimely death, $500.00." The remainder of the claim in a different handwriting read: "From 1948-49-50-51—Dec. 1951, November 24th, '48, $100.00. December 12, '49, $50.00. June 24th, '50, $150.00. October 26th, '51, $200.00." Respondent said he didn't know where the check was sent, but said he asked Matt where John Cicerich was. Respondent claimed that he verified the correctness of John's claim by the oral testimony

of Pigg and Coleman, hereinbefore mentioned. Respondent had previously represented John Cicerich.

As to item No. 10, the barmaid's claim for $200, respondent said that her loan to Walter Jones was supported by the testimony of Pigg and Coleman and by two other persons standing there in the tavern, who refused to give him their names, but that they stated that she gave Walter Jones $200 at a time when he was threatened with bodily harm or his life was threatened. Respondent quoted one of these unnamed men as stating that he knew that Cleo had loaned this colored boy (Walter Jones) some money one evening when he was in there, when a truck driver came in and threatened to punch Walter in the head.

As to item No. 11, the $25.00 claim of Charlie Zirkel. Zirkel was a bartender in Matt Cicerich's saloon, where the barmaid, Cleo Canfield, also worked. Respondent claims he paid Zirkel $25.00 in cash out of Annie's funds upon the oral testimony of Pigg and Coleman, the witnesses hereinbefore referred to, that they knew that Zirkel had loaned that amount of cash to Jones.

Respondent's theory of defense concerning the payment of the several claims in question was that Annie knew of most of the claims against her husband; that she knew the approximate amount of them, or knew of claims in excess of the payments subsequently made; that she knew she didn't have to pay them, but she insisted, against the advice of respondent, that she wanted them paid; and that she orally directed the payment of these claims. Respondent, however, admitted that he had previously testified before the Bar Committee to the effect that, when Annie visited St. Louis after the death of her husband, no one stated the amount of any claim, and no one knew that there were any claims, other than funeral expenses; and that he (respondent) knew nothing about the amount of any claims, even when the releases were sent to Memphis to be executed by Annie. Respondent had previously testified that, when the releases were sent to Memphis for Annie's signature, he didn't know anything about these claims that he later paid, except an income tax claim and the claim for funeral expenses. Respondent offered no evidence before the special commissioner other than his own testimony.

After quoting at length from the record, the special commissioner made the following observations, conclusions and findings, which are fully supported by the evidence: "John R. Oliver had the exclusive possession and control of all the funds. The money was not kept in a separate fund or account. It all remained in the hands of John R. Oliver and was subject exclusively to his order or orders.

"No statement as to the funds, the amount, size or location was ever given to Annie Jones or anyone for her, until after demands were being made by Annie Jones and/or some one on her behalf for an accounting of the funds.

"Oliver was in complete charge of the funds and all proceedings thereon at all times and in all places. He hunted up the claims, found one in Texas, John Cicerich. He passed upon all claims. He was the sole judge as to whether the claim should or should not be paid.

"Oliver did not consult or confer with any attorney about the manner in which he should proceed to hear the claims. There did not seem to appear to Oliver any complications to him as to how he should proceed in order to have a fair and just hearing. He could have talked with some fellow attorney and informed him that he had a very odd and peculiar matter pending [654] and asked such a fellow attorney how he thought would be the better way to proceed in justice to all and to protect himself from any comeback.

"Annie Jones was not consulted by letter, phone or otherwise. She did not know that an investigation of the claims of creditors was being made. John R. Oliver was attending to the entire proceeding. He was the sole judge. He had charge of the funds and had charge of the authority to do as he pleased. There was no one above him, or charged any authority with him. The places where the hearings were had were all in Matt Cicerich's saloon. All claims presented were allowed.

"None of the claims presented were supported by a written instrument of any kind. No promissory note, I.O.U., no cancelled check showing the payment of the alleged money loaned. In spite of the many items of varying amounts, large and small, all items seemed to be cash transactions.

"There was no court reporter or stenographer there to take the testimony of witnesses. Oliver made no memorandum as to what each witness said. Oliver made no record as to what was said; he has no memorandum in writing as to what was paid. In fact Oliver does not now remember the details of what the witnesses said at the hearing; and he has no records or memorandums by which he can refresh his memory.

"Oliver did all of the questioning of witnesses. The client, Annie Jones, was not present at any of the hearings. She was not invited to be there. She did not know they were going on. The client received no protection. The flow of client's money was directed away from her and direct into the hands of John R. Oliver.

"At the pretended hearings no witnesses were duly sworn. Oliver testified that he administered an oath to all witnesses but admitted that he was not a notary public and did not have legal authority to administer an oath to a witness. He stated however that he did administer the oath to all witnesses just to impress the witnesses. No minutes or record of the pretended hearings were taken by anyone.

"No person was present at any of such pretended hearings representing Annie Jones. Annie Jones nor anyone representing her had knowledge that such a pretended hearing or hearings were being

held. Not a pretended witness present who seemed to be opposed to any of the pretended claims. It was a friendly, agreeable and noncontroversial hearing or hearings among friends in a close relationship, who had no interest in Annie Jones.

"Mr. Oliver certainly must have realized as a practicing attorney that the methods he invoked in the pretended hearing of the claims in question were far below the standards of the legal profession."

The special commissioner concluded his report with the finding "that said John R. Oliver has wilfully, knowingly and unlawfully committed acts against the interest of the public, has been unethical and violated the oath of his office as a practicing attorney-at-law, and special commissioner recommends that the said John R. Oliver be permanently and fully removed from the practice of law in Missouri."

It is unnecessary for us to review the record further, except to say that, in view of respondent's background, training and experience, the record shows no extenuating circumstances. Respondent testified that he was born August 25, 1910, and was 44 years of age at the time of the hearing; that he "believed" he was admitted to the bar in this state in April 1939; that, at one time, he had worked for the United States District Court at St. Louis handling naturalization and passport matters; that he served as assistant circuit attorney in the city of St. Louis from 1940 to 1944; that he, thereafter, "handled the legal work for the Sales Tax Department of the State of Missouri"; that after the adoption of the 1945 Constitution, he was attorney for the State Department of Revenue; that he left the Department of Revenue in October 1950 and entered the private practice on a full-time basis; and that, at the times here in question, he maintained an office in the [655] International Building at 722 Chestnut in the city of St. Louis.

It is well settled that "the nature of a lawyer's profession necessitates the utmost good faith toward his client and the highest loyalty and devotion to his client's interests." In re Thomasson's Estate, 346 Mo. 911, 144 S.W. (2d) 79, 83. The relation between attorney and client is highly fiduciary and of a very delicate, exacting and confidential character, requiring a very high degree of fidelity and good faith on attorney's part. Laughlin v. Boatmen's Nat. Bank of St. Louis, Mo. Sup., 163 S.W. (2d) 761; Bybee v. S'Renco, 316 Mo. 517, 291 S.W. 459, 461. A breach of fidelity to a client's interest constitutes constructive fraud. Fiske v. Buder, 8 Cir., 125 F. (2d) 841; In re Conrad, 340 Mo. 582, 105 S.W. (2d) 1, 10.

In the case of In re Conner, 357 Mo. 270, 207 S.W. (2d) 492, 499, this court said: "Misconduct of attorneys in converting and using money held in a fiduciary capacity has been before us in other cases. We have uniformly held such conduct justifies disbarment. In State Bar Committee v. Stumbaugh, (Mo. Sup.), 123 S.W. (2d) 51, 53, this Court said: " 'Whether so provided by statute or not, it is always

a ground for the disbarment of an attorney that he has misappropriated the funds of his client, either by failing to pay over money collected by him for his client or by appropriating to his own use funds intrusted to his care." * * * "The law requires that a lawyer shall maintain a higher moral standard than simply to avoid conviction of embezzlement or larceny. His clients are entitled to rely on his honesty and on his devotion to their interests." ' "

A careful review of the entire record in this case convinces us that the charges made against respondent have been sustained by the overwhelming weight of the credible evidence. Accordingly respondent should be permanently disbarred from the practice of law. It is so ordered. All concur.