**RESOLUTION TRUST CORPORATION, Plaintiff,**

**v.**

**John M. GIBSON, William R. Kidwell, Jr., Robert K. McBride, Steven W. Mathena, Charles F. Mehrer, III, John W. Lounsbury, Floyd R. Gibson, Gertrude W. Gibson, Joseph H. Peters, William L. Brooks, William R. Cockefair, Jr., Ew-**

ing L. Lusk, Jr., Paul F. Woodard, Hugh G. Hadley, L.H. Johanson, Jack L. Reddin, M.D., Annette N. Morgan, Personal Representative of the Estate of William B. Morgan, Deceased, and Campbell, Morgan & Gibson, P.C., Defendants.

Civ. A. No. 92–0140–CV–W–8–6.

United States District Court, W.D. Missouri, W.D.

Sept. 10, 1993.

Clifford K. Stubbs, Lawrence D. Greenbaum, Douglas M. Greenwald, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, Patrick D. McAnany, McAnany, Van Cleave & Phillips, P.A., Lenexa, KS, David A. Vorbeck, Resolution Trust Corp., Kansas City, MO and Charles A. Getto, Lenexa, KS, for plaintiff/counterdefendant.

Joel Pelofsky, Russell S. Jones, Jr., Robert R. Raymond, James C. Sullivan, Shughart, Thomson & Kilroy, P.C., Kansas City, MO, Steven W. Mathena, Glendale, AZ, Daniel R. Young, Smith, Gill, Fisher & Butts, Kansas City, MO, Franklin T. Thackery, Daniel Lee Duncan, Martin M. Bauman, Martin M. Bauman, P.C., St. Joseph, MO, Patrick C. Cena, Thomas E. Deacy, Jr., Deacy & Deacy; Donald W. Giffin, Spencer, Fane, Britt & Browne; Peter E. Strand, Shannon Reynolds Spangler, Shook, Hardy & Bacon; James W. Humphrey, Jr., John B. Gillis, Kuraner & Schwegler; Glenn McCann, Knipmeyer, McCann, Smith, Manz & Gotfredson; David M. Harding, Van Osdol, Magruder, Erickson

& Redmond, P.C.; Michael J. Thompson, John G. Mazurek, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, for defendants/counterclaimant.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on three separate summary judgment motions, all by defendants.[1] The three motions are as follows: (1) Defendant John M. Gibson's motion for summary judgment (Doc. 433) on Counts III and IV, which allege legal malpractice; (2) Defendants John M. Gibson, Gertrude W. Gibson, and William R. Kidwell, Jr.'s motion for summary judgment (Doc. 435) on all claims based on excessive compensation; and (3) Defendants John M. Gibson, and William R. Kidwell's motion for partial summary judgment (Doc. 439) on Counts I and II to the extent they make claims involving the acquisition of North American Development and Management, Inc. ("NADM") and certain "side letters."

For the reasons set forth in this order, defendants' motions for summary judgment are disposed of as follows: (1) defendant John M. Gibson's motion on Counts III and IV (Doc. 433) is denied; (2) defendants John M. Gibson, Gertrude W. Gibson and William R. Kidwell, Jr.'s motion on all claims based on excessive compensation (Doc. 435) is denied; and (3) defendants John M. Gibson and William R. Kidwell's motion on claims involving North American Development and Management, Inc., and certain "side letters" (Doc. 439) is denied.

## FACTUAL BACKGROUND

For the purposes of defendants' summary judgment motions, the court makes the following findings of fact.

### Introduction

Resolution Trust Corporation ("RTC") brought this action for officers' and directors' liability and for legal malpractice against former officers, directors, and lawyers of Blue

Valley Federal Savings and Loan Association ("Blue Valley").

Blue Valley was a federally chartered, federally insured mutual savings and loan association. Its principal place of business was in the Western District of Missouri.

On February 16, 1989, the Federal Home Loan Bank Board ("FHLBB") determined Blue Valley was insolvent and appointed the Federal Savings and Loan Insurance Corporation ("FSLIC") as conservator. When RTC came into existence in the summer of 1989, it assumed the position of conservator of Blue Valley. On June 15, 1990, RTC became the receiver of Blue Valley. RTC, in its corporate capacity, acquired certain assets from the RTC receiver. Such assets included any and all causes of action and claims against any officer, director, lawyer or any other Blue Valley agent arising out of the acts of any such persons or arising out of performance or non-performance of their duties.

### The Relevant Parties

The three motions disposed of by this order are brought by one, or a combination of, the following three defendants: (1) John M. Gibson; (2) William R. Kidwell, Jr.; and (3) Gertrude W. Gibson.

Defendant John M. Gibson was a member of the Blue Valley Board of Directors from approximately 1968 until October 8, 1987. He was Chairman of the Board from October 8, 1981, until October 8, 1987. Additionally, he was a principal and shareholder in Campbell, Morgan, & Gibson, P.C., a law firm that handled legal business for Blue Valley.

Defendant William R. Kidwell, Jr. was a member of the Blue Valley Board of Directors from approximately 1983 until October 8, 1987.

Defendant Gertrude W. Gibson was a member of the Blue Valley Board of Directors from January 1964 until approximately March 1, 1988.

---

1. With each summary judgment motion, defendants also have filed a motion seeking a hearing. Because the court has determined that oral argument would not be helpful in resolving the issues, the summary judgment motions have been determined on the basis of the parties' written memoranda. The defendants' motions seeking hearings are therefore denied.

*The North American Development and Management, Inc. Transaction*

In July 1984, defendants John M. Gibson ("Gibson"), William R. Kidwell ("Kidwell"), and William B. Morgan ("Morgan"), along with two other business associates, incorporated NADM. Subsequently, Gibson, Kidwell, and Morgan decided to sell NADM to Blue Valley. On February 23, 1985, at a regular meeting, with Gibson and Kidwell abstaining, the Blue Valley Board unanimously voted to approve the purchase of NADM.

On May 29, 1985, the Federal Home Loan Bank Board ("FHLBB") began an examination of Blue Valley's acquisition of NADM. On October 22, 1985, the Blue Valley Board unanimously voted to sell NADM.

In or about September 1985, after the FHLBB initiated its investigation of Blue Valley's purchase of NADM, the Blue Valley Board hired both the law firm of Lathrop, Koontz, and Norquist and the investigative firm of Clarence Kelly and Associates to investigate NADM and its purchase by Blue Valley. Additionally, the Blue Valley Board assigned William F. Pollard to investigate the "side letters" issued by Robert K. McBride.

In 1987, the FHLBB began an investigation into the conduct of Gibson and Kidwell. The investigation included both the acquisition of NADM and the "side letters" issued by Robert K. McBride.

Following the commencement of the FHLBB's 1987 investigation, discussions were conducted regarding the possibility of obtaining Gibson's and Kidwell's resignations from Blue Valley. The discussions concluded in the following arrangement: The FHLBB terminated its investigation of Gibson and Kidwell and Gibson and Kidwell resigned from Blue Valley. Additionally, Blue Valley entered into a "Mutual Limited Release" with Gibson and Kidwell. According to the terms of the release, Gibson and Kidwell, in consideration for their resignations and release of any claims they had against Blue Valley, were released from any and all claims Blue Valley had against them. Specifically, the release states as follows:

... in consideration of the resignations from all posts by Messrs. Gibson and Kidwell and, further, in consideration for the releases received hereunder from Messrs. Gibson and Kidwell, Blue Valley ... and each of its subsidiaries do hereby release ... any and all claims, causes of action, and possible causes of action which have heretofore been the subject of prior Blue Valley investigations, including and limited to, the acquisition of North American Development and Management, Inc., the issuance ... of "side letters" releasing personal guarantees and recourse in connection with the placing of certain real estate loans, and Solaris–Winter Park.

Defendants Gibson and Kidwell's Exhibits 10 and 11. Additionally, the release provides that it "is meant to be binding upon the heirs, successors, and assigns of the parties hereto." *Id.* However, its scope is limited by the following provision: "Nothing contained [in the release] shall limit the FSLIC in the performance of its regulatory or statutory duties in the future." *Id.*

### ANALYSIS

A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material fact.**" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1985). The substantive law identifies which issues are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* Thus, "[o]nly [genuine] disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant has the burden of showing the absence of a genuine issue of material fact. The movant may discharge its burden "by

'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the [nonmovant's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1985). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2553. Once the movant makes a properly supported motion, the nonmovant must go beyond the pleadings and, by affidavits or the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is no genuine issue for trial. Fed.R.Civ.Pro. 56(e). *See also Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting 56(e)).

A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *Green v. United States Dept. of Labor,* 775 F.2d 964, 973 (8th Cir.1985).

Rule 56(c) requires the court to enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2553.

Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. That is, the court decides whether there are any genuine factual issues that can be resolved only by a finder of fact because they reasonably may be resolved in favor of either party. *Id.*

## I. JOHN M. GIBSON'S MOTION FOR SUMMARY JUDGMENT ON COUNTS III and IV.

Defendant argues that the court should grant his summary judgment motion as to RTC's legal malpractice claims of both Counts III and IV because (1) no attorney-client relationship existed between defendant and Blue Valley and (2) even if such a relationship existed, defendant has been released from any possible claims RTC could bring for legal malpractice.

## A. WHETHER AN ATTORNEY CLIENT RELATIONSHIP EXISTED BETWEEN JOHN M. GIBSON AND BLUE VALLEY

Defendant argues he is entitled to summary judgment on the legal malpractice claims of Counts III and IV because RTC cannot establish an essential element of its case, namely that an attorney-client relationship existed between defendant and Blue Valley.

The attorney-client relationship is an essential element of a legal malpractice claim. In Missouri, a legal malpractice claim consists of the following four essential elements: (1) an attorney-client relationship; (2) conduct constituting either negligence or breach of contract by defendant; (3) proximate causation (i.e., defendant's conduct must be the proximate cause of plaintiff's damages); and (4) but for causation (i.e., but for defendant's conduct, plaintiff would have been successful on the underlying claim). *Wentz v. Industrial Automation,* 847 S.W.2d 877, 876 (Mo. App.E.D.1992); *Scher v. Sindel,* 837 S.W.2d 350, 351 (Mo.App.E.D.1992); *Boatright v. Shaw,* 804 S.W.2d 795, 796 (Mo.App.1990).

Where the existence of an attorney-client relationship is in dispute, and the attorney and alleged client deny its existence, the party asserting the relationship exists bears the burden of proof. *See Qualls v. Field Enterprises Education Corporation,* 302 F.Supp. 152, 153 (E.D.Mo.1969) (writing that "where the relationship of attorney and client is asserted, and is denied by the attorney and the alleged client, the burden of proof rests upon the party making the claim of the relationship"); *Schwarze v. May Dept. Stores,* 360 S.W.2d 336, 339 (Mo.App.1962) (noting that "'[w]here the relationship of attorney and client is asserted to exist, and it being denied by the attorney and the alleged client, the burden of proof certainly rests upon the party making the claim of such relationship").

In *Celotex,* the Supreme Court explained that Rule 56(c) requires entry of summary judgment against a nonmovant who is unable

to make a showing sufficient to establish the existence of an essential element on which the nonmovant bears the burden of proof. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. Accordingly, defendant is correct that this court must enter summary judgment against RTC if RTC cannot make a showing sufficient to establish the existence of an attorney-client relationship between defendant and Blue Valley. However, RTC has made a showing sufficient to allow a jury reasonably to find that an attorney-client relationship existed between defendant and Blue Valley. Therefore, defendant's motion is denied insofar as it is premised upon the absence of an attorney-client relationship.

■ Under Missouri law, the attorney-client relationship is an agency relationship governed by the same law as that which applies to agency relationships generally. *Sappington v. Miller*, 821 S.W.2d 901, 904 (Mo.App.1992); *Southwestern Bell Tel. Co. v. Roussin*, 534 S.W.2d 273. 276 (Mo.App.1976); *State ex rel. AMT v. Weinstein*, 411 S.W.2d 267, 272 (Mo.App.1967).

■ An agency relationship results from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Leidy v. Taliaferro*, 260 S.W.2d 504, 505 (Mo.1953); *Groh v. Shelton*, 428 S.W.2d 911, 916 (Mo.App.1968); *Dillard v. Rowland*, 520 S.W.2d 81, 90 (Mo.App. 1974). An agency relationship may be established by consent manifested in words and conduct. *Groh*, 428 S.W.2d at 916. Neither a contract nor an express appointment and acceptance is essential to the formation of an agency relationship. *Id.*

■ Furthermore, in Missouri, "[t]he creation of the attorney-client relationship 'is sufficiently established when the advice and assistance of the attorney are sought and received in matters pertinent to his profession.'" *Erickson v. Civic Plaza Nat. Bank of Kansas City*, 422 S.W.2d 373, 378 (Mo. App.1967). *See also State v. Longo*, 789 S.W.2d 812, 815 (Mo.App.1990) (citing *Erickson* for the same proposition).

Essentially, defendant's argument proceeds as follows: RTC's malpractice claims are limited to the NADM transaction; defendant did not provide any legal advice or service to NADM in connection with the NADM transaction; therefore, defendant was not standing in an attorney-client relationship with Blue Valley during a time period relevant to the NADM transaction.

Initially, it is necessary to mention that, contrary to defendant's arguments, RTC is not bound by the Amended Factual Statement. The Amended Factual Statement is not a pleading and is not binding upon RTC's claims.

Even assuming that RTC's malpractice claims are limited to conduct relating to the NADM transaction, there is sufficient evidence for a jury reasonably to find an attorney-client relationship existed.

Defendant relies chiefly on his own affidavit and a resolution passed by the Blue Valley Board at their October 22, 1985, meeting. In his affidavit, defendant denies providing legal services to or for Blue Valley in connection with the NADM transaction. Defendant Gibson's Exhibit 1, ¶ 3. He further states that he does not believe any of the Blue Valley Directors looked to him for legal advice. *Id.* In support of these contentions, defendant refers the court to a portion of a resolution appearing in the Board's minutes from their October 22, 1985, meeting. The pertinent portion of this resolution states as follows: "it is understood by all members of the Board that John M. Gibson was hired as Chairman for business reasons and not as legal counsel." Defendant Gibson's Exhibit 3, p. 2.

In response, RTC sets forth specific facts in contravention of, and in addition to, those relied upon by defendant. Specifically, RTC sets forth facts sufficient to enable a jury reasonably to conclude that defendant maintained an attorney-client relationship with Blue Valley. RTC relies on language from the "Business Plan" contained in the minutes of the May 21, 1985, Blue Valley Board meeting. The "Business Plan" describes defendant as the "principal legal counsel for the Association." Plaintiff RTC's Exhibit 1, p. 4. RTC supports this description with William R. Cockefair's statement, taken from his de-

position, that the "Business Plan's" description of defendant as "principal legal counsel for the Association" was accurate. Cockefair deposition, pp. 518–519.

Although a client's ability to terminate an attorney-client relationship is beyond dispute, this court believes there is a reasonable dispute as to whether Blue Valley ever terminated its attorney-client relationship with defendant. Defendant relies on the Board resolution of October 22, 1985, as nearly conclusive evidence that his relationship with Blue Valley had been terminated. Additionally, defendant supplements the resolution with his own affidavit in which he states he did not provide any legal service or advice to Blue Valley in connection with the NADM transaction. However, whether the parties terminated the attorney-client relationship is a question of fact for the jury and ordinarily should not be decided as a matter of law.[2]

In Missouri, "[a] fiduciary relationship exists between attorney and client." *Jo B. Gardner, Inc., v. Beanland,* 611 S.W.2d 317, 320 (Mo.App.1980). *See also In re Oliver,* 365 Mo. 656, 285 S.W.2d 648, 655 (1956) (stating that "[t]he relation between attorney and client is highly fiduciary ... requiring very high degree of fidelity and good faith on attorney's part"). As previously stated in an earlier order in this case, "[t]he existence or absence of a fiduciary relationship requires factual findings and must necessarily rest with the finder of fact, in this case a jury. [citation omitted]. Only in rare cases will it be proper for the court to decide the issue as a matter of law." *See* Memorandum and Order, filed April 13, 1993, at p. 7 (Doc. 415).

This court believes there is sufficient evidence to support a reasonable juror's conclusion that an attorney-client relationship existed. Furthermore, this court is not persuaded there is no genuine issue as to whether such relationship existed at the time of the NADM transaction. Although the May 21, 1987, Board resolution states that defendant

was not hired as legal advisor, this court believes RTC possesses, and has specifically set forth, sufficient facts to require the court to deny defendant's motion. Also supporting denial of defendant's motion is the "sound principle that the determination of an agency relationship is a highly factual one generally left to the province of the jury." *Grand Motors, Inc. v. Ford Motor Co.,* 564 F.Supp. 34, 46 (W.D.Mo.1982).

RTC has made a showing sufficient to establish the existence of a genuine issue of material fact. Therefore, defendant's motion is denied insofar as it relies on the absence of an attorney-client relationship.

### B. WHETHER JOHN M. GIBSON HAS BEEN RELEASED FROM RTC'S LEGAL MALPRACTICE CLAIMS

Defendant argues he is entitled to summary judgment on the legal malpractice claims of Counts III and IV because the undisputable facts show he has been released from all such claims. For the reasons set forth in part III of this memorandum, defendant's motion is denied insofar as he relies on the release as a bar to RTC's legal malpractice claims.

### II. JOHN M. GIBSON, GERTRUDE W. GIBSON, and WILLIAM R. KIDWELL'S MOTION ON ALL CLAIMS BASED ON EXCESSIVE COMPENSATION.

Defendants argue they are entitled to summary judgment on all claims based on excessive compensation. Their argument rests on their interpretation of the Missouri business judgment rule. Specifically, they contend that RTC's claims of excessive compensation are insufficient as a matter of law. This court disagrees and, therefore, denies defendants' motion.

---

**2.** In *Northern v. McGraw–Edison Co.,* 542 F.2d 1336, 1343 (8th Cir.1976), the Eighth Circuit stated that

[i]n assessing whether an individual occupies the status of an agent, it is necessary to review the facts and circumstances surrounding that individual activities to determine whether the

purported principal exerts the requisite control over the individual so as to create an agency relationship. [citation omitted]. Since this determination requires the finding and weighing of numerous facts, the ultimate resolution is appropriately left to the province of the jury in most instances.

Defendants argue that executive compensation decisions are purely matters of business judgment. Thus, such decisions receive protection from the Missouri business judgment rule. However, even assuming defendants' compensation decisions are purely matters of business judgment, and thus fall within the shelter of the business judgment rule, this court disagrees with defendants' argument that RTC cannot raise any genuine issue for trial.

Where a matter calls for the business judgment of the board of directors, the only time a Missouri court will interfere is "where the matter complained of is ultra vires, illegal, fraudulent ... or where the business judgment is exercised unfairly and in a dishonest manner." *Neidert v. Neidert,* 637 S.W.2d 296, 301 (Mo.App.1982); *Broski v. Jones,* 614 S.W.2d 300, 304 (Mo.App.1981); *Saigh v. Busch,* 396 S.W.2d 9, 22 (Mo.App. 1965). RTC does not allege defendants' conduct was ultra vires, illegal, or fraudulent. Therefore, if the business judgment rule applies, it limits the RTC's claims to conduct involving dishonesty and unfairness.

Assuming the business judgment rule applies to the instant case,[3] Missouri case law requires a two-step inquiry: (1) was the matter under consideration one that called for the defendants' business judgment; and (2) if so, did the defendants exercise their judgment fairly and honestly. *See Neidert,* 637 S.W.2d at 301; *Broski,* 614 S.W.2d at 304; *Saigh,* 396 S.W.2d at 22.

Defendants claim the record clearly shows they acted honestly and fairly in approving the questioned compensation program. In support, defendants focus exclusively on the procedure producing what they have titled "the Executive Compensation Plan."

From their "Suggestions in Support," it seems apparent they discount the fact that the business judgment rule is not an absolute bar to liability. Defendants support their motion with material that speaks to the fairness and honesty of their conduct. Contrary to the defendants' assertions, the material they present does not establish, as a matter of law, that they acted both fairly and honestly in regard to the questioned compensation program. Therefore, this court is unable and unwilling to agree with defendants' contention that "[t]he undisputed record clearly demonstrates that the directors appropriately exercised their business judgment in approving the executive compensation plan." Defendants' Suggestions in Support, p. 7. Instead, whether defendants exercised their business judgment in a fair and honest manner is a question of fact for the jury. Furthermore, RTC has set forth specific facts sufficient to require submission of this issue to the jury.

Thus, this court concludes that there remains a genuine issue for trial, namely whether defendants acted fairly and honestly in approving the questioned compensation program.

Although RTC does not accept defendants' claim that the business judgment rule protects the challenged conduct, nevertheless, RTC urges that defendants' approval of the questioned compensation program was both unfair and dishonest. Specifically, RTC challenges the employment contracts of Steven W. Mathena and Robert K. McBride, the compensation paid to both John M. Gibson and Charles F. Mehrer, and several expense-paid trips by the Board to Phoenix to conduct meetings.

RTC challenges the employment contracts of both Steven W. Mathena ("Mathena") and Robert K. McBride ("McBride"). These contracts were part of Blue Valley's agreement to purchase Valentine Mortgage Company ("Valentine"). According to the terms of the contracts, both Mathena and McBride were to be employed for five years at a base salary of $90,000 plus bonus compensation equal to 20 percent of Valentine's net operating profits. RTC contends that the terms of the contracts, specifically as they related to bonus compensation, encouraged Mathena and McBride to make lots of loans without tying quantity to quality. RTC supports this contention with a statement by Ewing Lusk, taken from his deposition, in which he agrees that the contracts contained incentives to

---

3. For the purposes of this motion only, this court assumes the defendants' questioned compensation decisions are matters calling for defendants' business judgment.

make lots of loans, but not necessarily good loans. Deposition of Ewing L. Lusk, pp. 416–417.

RTC challenges the compensation the Board paid to both John M. Gibson and Charles F. Mehrer. RTC relies on the deposition testimony of their proposed expert, Bruce Morgan ("Morgan"). Specifically, RTC uses Morgan to support their claims that the executive compensation paid to defendants John M. Gibson and Charles F. Mehrer, in the form of salaries and bonuses, was excessive. Deposition of Bruce Morgan, pp. 27–28.

RTC challenges several expense-paid trips the Blue Valley Board took to Phoenix to hold meetings. Specifically, RTC attacks the February 1986 and February 1987 Blue Valley Board meetings. At both meetings, the Board stayed at the Phoenix Biltmore Hotel. Deposition of Ewing L. Lusk, pp. 507 and 524. As Hugh Hadley stated in his testimony, the trips were "pretty fancy" and the Board did not "go second-class" in any respect. Deposition of Hugh G. Hadley, pp. 49–50. The 1986 meeting cost $41,000 and the 1987 meeting cost $43,000. Deposition of Ewing L. Lusk, p. 543. These expenditures were made at a time when Blue Valley was having difficulty meeting its capital requirements.

This court rejects defendants' argument that they are entitled to judgment as a matter of law due to RTC's inability to raise any genuine issue at trial. Assuming the business judgment rule applies, RTC is able to recover if it shows defendants acted unfairly and dishonestly. The quality of defendants' conduct, the fairness and honesty of their acts, is a question of fact. RTC has set forth specific facts sufficient to demonstrate that there remains a genuine issue as to whether defendants acted in accordance with the standards of the Missouri business judgment rule. Therefore, defendants' motion is denied.

## III. JOHN M. GIBSON and WILLIAM R. KIDWELL'S MOTION ON COUNTS I and II TO THE EXTENT THEY INVOLVE NADM AND CERTAIN SIDE LETTERS.

Defendants argue they are entitled to partial summary judgment on Counts I and II to the extent these counts state claims regarding Blue Valley's acquisition of NADM and certain "side letters" issued by Robert K. McBride. Essentially, defendants argue as follows: (1) the release is valid (i.e., there is sufficient consideration); (2) the release is good against assignees and successors to Blue Valley; (3) RTC is merely an assignee and successor to Blue Valley; (4) therefore, the release is effective against RTC and entitles defendants to summary judgment on Counts I and II, insofar as they relate to the NADM transaction and the "side letters."

### A. WHETHER SUFFICIENT CONSIDERATION SUPPORTS THE RELEASE

Defendant contends the release is valid because it is supported by sufficient consideration. Specifically, defendant claims the recited consideration, Gibson's and Kidwell's resignations and their release of any claims they may have had against Blue Valley, is sufficient to support the release.

■ Where the execution of the release is not in dispute, the party attacking the release bears the burden of establishing its invalidity. *Anselmo v. Manufacturer's Life Ins. Co.,* 595 F.Supp. 541, 549 (W.D.Mo. 1984), *aff'd,* 771 F.2d 417 (8th Cir.1985). *See also Jenkins v. Simmons,* 472 S.W.2d 417, 420 (Mo.1971) (stating that "where the execution of release purporting to rest on a consideration is admitted the burden is on the plaintiff to prove some invalidity in the release"). RTC does not challenge the execution of the release. Instead, RTC challenges its validity by claiming defendants gave no consideration. RTC bears the burden in attacking the consideration supporting the release. RTC has not met its burden.

■ A release is a contract of compromise and settlement. *Anselmo,* 595 F.Supp. at 549; *Foster v. Aetna Life Ins. Co. of Hartford Conn.,* 352 Mo. 166, 176 S.W.2d 482, 485 (1943); *Stahly Cartage Co. v. State Farm Mutual Auto. Ins. Co.,* 475 S.W.2d 438, 441 (Mo.App.1971). As a contract, a release is valid only if supported by consideration. *An-*

*selmo,* 595 F.Supp. at 550; *Grand Motors, Inc. v. Ford Motor Co.,* 564 F.Supp. 34, 39 (W.D.Mo.1982); *Gee v. Nieberg,* 501 S.W.2d 542, 544 (Mo.App.1973). The consideration may consist of either a forbearance or a detriment. *Lugena v. Hanna,* 420 S.W.2d 335, 338 (Mo.1967).

■ Gibson's and Kidwell's resignations provide sufficient consideration to support the release. By resigning, Gibson and Kidwell incur a detriment which, by itself, is sufficient to support the release. *See Wells v. Hartford Accident and Indemnity Co.,* 459 S.W.2d 253, 260 (Mo. banc 1970) (writing that either detriment to the promisee or benefit to the promisor is sufficient to support a contract). When a promisee does anything she is not obligated to do or refrains from doing anything she has a right to do, the promisee incurs a detriment sufficient to support a contract. *Id.* In the instant case, Gibson and Kidwell could not be removed without cause. That is, before Blue Valley could terminate them, it had to make a showing sufficient to satisfy the "cause" requirement. When they resigned, Gibson and Kidwell removed the onus of establishing cause from Blue Valley. They were not legally obligated to relinquish their positions because Blue Valley had yet to establish cause. Indeed, they had a right to remain in their positions until Blue Valley made the requisite showing. Therefore, their resignations are sufficient consideration because they constitute both a benefit to the promisor, Blue Valley, and a detriment to the promisee, Gibson and Kidwell.

Even assuming Blue Valley could eventually establish cause, the resignations benefitted Blue Valley in the sense that it no longer had to make a showing to secure Gibson's and Kidwell's removal. The resignations saved Blue Valley the trouble and expense of establishing cause. Further, Gibson and Kidwell incurred a detriment because by resigning they relinquished their procedural right to

remain in their positions and force Blue Valley to establish cause. Ordinarily, provided there is either forbearance or detriment, courts consider neither the quality nor the amount of the consideration. *Lugena,* 420 S.W.2d at 339 (quoting *Eberting v. Skinner,* 364 S.W.2d 829, 834 (Mo.App.1963).

## B. WHETHER THE RELEASE BINDS RTC

By its terms, the release binds the "heirs, successors, and assigns" of the parties to the release. Defendants Gibson and Kidwell's Exhibits 10 and 11. Also by its terms, the release does not "limit the FSLIC in the performance of its regulatory or statutory duties in the future." *Id.*

■ When interpreting a release, Missouri courts give full effect, within the context of the agreement as a whole, to language that is plain and unambiguous on its face unless the release is based on fraud or unfair dealings. *Andes v. Albano,* 853 S.W.2d 936, 941 (Mo. banc 1993). The release plainly and unambiguously bars the "heirs, successors, and assigns" of Blue Valley from bringing claims against Gibson and Kidwell for their conduct involving the NADM transaction and the "side letters." Therefore, unless the release is based on fraud or unfair dealings, RTC's claims are barred to the extent they are brought as a successor or assign of Blue Valley.

■ Although the release is clear and unambiguous as to the fate of claims brought by successors and assigns of Blue Valley, it is ambiguous as to whether RTC's claims are within its scope.[4]

In its savings clause, the release provided that "nothing contained herein shall limit the FSLIC in the performance of its regulatory or statutory duties in the future." Defendants Gibson and Kidwell's Exhibits 10 and 11. This savings clause creates an exception by which the FSLIC remains able to assert

4. RTC urges the court to hold the release voidable as the product of an unfair interested director transaction. RTC's contention appears akin to claiming the release is invalid because it is based on unfair dealings. However, because the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") surrendered

the pertinent statutory duties of FSLIC to RTC, this court is convinced that RTC stands in the shoes of FSLIC for the purposes of the release. In order to determine whether RTC is subject to the terms of the release, this court analyzes the release as it would affect FSLIC's ability to bring the pertinent actions.

claims in the performance of its regulatory and statutory duties. Because RTC is the successor to FSLIC, and has assumed the statutory duties in question here (i.e., the duty to bring professional and directors and officers' liability suits), RTC's ability to bring its claims against defendants is limited to the same extent the release limits FSLIC's ability to bring them.

Therefore, whether the release bars RTC's claims depends on whether the release would bar FSLIC from bringing the same claims.

## 1. FIRREA, FSLIC, and RTC

█ The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") abolished FSLIC and created RTC. *See Castleglen, Inc. v. Commonwealth Sav. Ass'n,* 728 F.Supp. 656, 661 (D.Utah 1989), *aff'd,* 984 F.2d 1571 (10th Cir.1993). FIRREA created RTC to succeed FSLIC as conservator or receiver of savings and loans that went into conservatorship or receivership between January 1, 1989, and August 1, 1989. *Id.* Accordingly, RTC succeeded FSLIC as receiver of Blue Valley, which went into FSLIC receivership on February 16, 1989.

Congress gave RTC the duty of managing and resolving all cases involving failed savings and loans the accounts of which were insured by FSLIC prior to FIRREA and for which a conservator or receiver was appointed after December 31, 1988, and before October 1, 1993. 12 U.S.C. § 1441a(b)(3)(A)(i–ii). As previously stated, Blue Valley went into FSLIC receivership on February 16, 1989. Thus, RTC has the statutory duty to manage and resolve the instant case.

Congress gave RTC many of the duties previously assigned to FSLIC. These duties flow from RTC's obligation to manage and resolve cases involving failed thrifts, the deposits of which were insured by FSLIC. In order to aid RTC in the execution of its statutory duties, Congress provided RTC with the power to bring professional and directors' and officers' liability suits. *See* 12 U.S.C. § 1441a(b)(4)(A) and 12 U.S.C. § 1821(k).

Prior to FIRREA, FSLIC was responsible for managing and resolving cases involving failed thrifts, the deposits of which were insured by FSLIC. Moreover, prior to FIR-REA, FSLIC had the responsibility to act as conservator and receiver for these failed thrifts. Now these responsibilities belong to RTC. With the enactment of FIRREA and the elimination of FSLIC, RTC has stepped into the shoes of FSLIC and now has the responsibility to manage and resolve cases such as the one before the court here. Where FSLIC was the responsible government party prior to FIRREA, now RTC is the responsible government party. Therefore, this court is persuaded that for the purposes of the release, RTC enjoys the same treatment under the savings clause as would FSLIC.

## 2. The Savings Clause

The parties disagree as to the scope of the release, particularly as to the FSLIC's treatment under the savings clause. A mere disagreement as to how a contract should be construed does not create an ambiguity. *Barklage v. Metropolitan Life Ins. Co.,* 614 F.Supp. 51, 58 (W.D.Mo.1985). However, in the instant case there is more than a mere disagreement between the parties as to how the release should be construed. When taken within the context of the whole agreement, the language of the release is unclear.

█ Whether a contract is ambiguous is a question of law. *Lehman Bros. Kuhn v. Clark Oil & Refining,* 739 F.2d 1313, 1317 (8th Cir.1984). In Missouri, "[a] contract is ambiguous only if its terms are susceptible of more than one meaning so that reasonable men may fairly and honestly differ in their construction of the terms." *Jake C. Byers, Inc. v. J.B.C. Investments,* 834 S.W.2d 806, 816 (Mo.App.1992). When determining whether the contract is ambiguous, the court must consider the disputed language in the context of the whole contract and give the terms their natural and ordinary meaning. *Lehman Bros,* 739 F.2d at 1317. *See also Jake C. Byers,* 834 S.W.2d at 816.

█ The savings clause states that "nothing contained herein shall limit the FSLIC in the performance of its regulatory or statuto-

ry duties in the future." Defendants Gibson and Kidwell's Exhibits 10 and 11. The language of this clause is ambiguous. Read in isolation from the rest of the release, this clause fairly can be read to preserve all of the FSLIC's claims against the two defendants. However, when read with the release as a whole, it is possible to understand the savings clause to require either of two inconsistent results. Specifically, the savings clause could represent an effort to foreclose either (1) all claims against defendants regardless of who brings them or (2) only those claims brought by parties standing in the shoes of Blue Valley, but not those claims brought by FSLIC in the performance of its statutory duties. Defendants argue that a plain reading of the release requires the court to accept the first interpretation. This interpretation requires one to read references to "future" as a limiting device. Specifically, it requires one to understand the release as barring all claims against defendants stemming from Blue Valley's past investigations regardless of the party bringing them. Accordingly, the savings clause's use of the phrase "in the future" prohibits FSLIC from bringing any claims related to Blue Valley's past investigations. If one reads all references to the "future" as a limiting device, and if one reads all references to the "future" consistently, the first interpretation is reasonable.

RTC argues that a plain reading of the release requires the court to accept the second interpretation. This interpretation allows one to read the release as merely limiting claims brought by parties standing in the shoes of Blue Valley. Thus, it allows one to read the savings clause as preserving all of the FSLIC's claims to the extent they are brought in the performance of its regulatory or statutory duties. At first glance, the simple wording of the savings clause seems only to serve to reassure any reader of the continued vitality of FSLIC enforcement actions. Indeed, this interpretation may be reinforced

by the fact that the only reference the release makes to FSLIC is in the savings clause (i.e., the specific language of the savings clause could indicate that the FSLIC is exempt from the general language of the release) [5]. Furthermore, since nowhere within the four corners of the release does FSLIC, or any other government entity, assent to the terms of the release, it is reasonable to read the savings clause as a recognition of the continued vitality of FSLIC enforcement actions.

In order to remove the ambiguity and accurately determine the parties' intent as to the scope of the release, it is necessary to look outside the writing. Indeed, in Missouri "[a]ny question regarding the scope and extent of [a] release is to be resolved according to what may fairly be said to have been within the contemplation of the parties at the time the release was given." *Andes,* 853 S.W.2d at 941. The court is to resolve such a question "in light of all the surrounding facts and circumstances under which the parties acted." *Id.* The intention of the parties governs the court's inquiry. *Id.*

■ However, the intent of the parties to an ambiguous contract is a question of fact and cannot be resolved by summary judgment. *Severson v. Fleck,* 251 F.2d 920, 923 (8th Cir.1958); *Aetna Life Ins. Co. v. Bowen,* 308 F.Supp. 1394, 1396 (W.D.Mo.1969). *E.g., Leberman v. John Blair & Co.,* 880 F.2d 1555, 1559 (2d Cir.1989); *Ryan v. Chromalloy American Corp.,* 877 F.2d 598, 602 (7th Cir.1989); *Southern Natural Gas Co. v. Pursue Energy,* 781 F.2d 1079, 1081 (5th Cir. 1986). "When a written contract is ambiguous, a triable issue of fact exists as to its interpretation, thus precluding the entry of summary judgment." *Leberman,* 880 F.2d at 1559.

■ Since this court has determined the release is ambiguous, there is a triable issue

---

**5.** This court recognizes that "[w]hen a release contains both general and specific language, the general language will be presumed to have been used in subordination to the specific, and will be construed and limited accordingly." *Moore v. Bentrup,* 840 S.W.2d 295, 297 (Mo.App.1992). However, the parties' use of the term "future" makes it unclear whether the savings clause preserves all FSLIC claims or only those unrelated to the NADM transaction and the side letters (i.e., the parties' use of the term "future" makes it unclear to what extent the general should be subordinated to the specific).

of fact for the jury as to its interpretation. Therefore, defendants' motion for summary judgment is denied.

**IT IS BY THE COURT THEREFORE ORDERED** that defendant John M. Gibson's motion for summary judgment (Doc. 433) on Counts III and IV is denied.

**IT IS FURTHER ORDERED** that defendants John M. Gibson, Gertrude W. Gibson, and William R. Kidwell, Jr.'s motion for partial summary judgment (Doc. 435) on all claims based on excessive compensation is denied.

**IT IS FURTHER ORDERED** that defendants John M. Gibson and William R. Kidwell's motion for summary judgment (Doc. 439) on Counts I and II to the extent they make claims involving the NADM transaction and the "side letters" is denied.